J-A21018-17

2018 PA Super 39

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MICHAEL PAUL FOUST, | |
| Appellant | No. 1118 WDA 2016 |

Appeal from the Judgment of Sentence July 5, 2016
In the Court of Common Pleas of Venango County
Criminal Division at No(s): CP-61-CR-0000679-1993

BEFORE: BENDER, P.J.E., OLSON and STABILE, JJ.

OPINION BY OLSON, J.: **FILED FEBRUARY 21, 2018**

## I. Introduction

Appellant, Michael Paul Foust, appeals from the judgment of sentence entered on July 5, 2016, as made final by the denial of his post-sentence motion on July 19, 2016. In this case of first impression in Pennsylvania, we consider whether a term-of-years sentence which exceeds a juvenile homicide defendant's life expectancy constitutes an unlawful *de facto* sentence of life imprisonment without the possibility of parole ("LWOP"). As an initial matter, we hold that because the Supreme Court of the United States has severely limited the circumstances under which juvenile defendants may be sentenced to LWOP, a *de facto* LWOP sentence is illegal in certain circumstances when imposed upon a juvenile offender. We also conclude that, in cases such as the present one that involve multiple killings, we must evaluate the sentence

for each crime separately when determining if a term-of-years sentence constitutes a *de facto* LWOP sentence. Finally, we affirm Appellant's judgment of sentence because, when separately considered, the consecutive, 30-years to life sentences imposed in this case for two killings do not constitute unlawful *de facto* LWOP punishments nor did the trial court abuse its discretion in imposing these sentences.

## A. Factual Background

On November 22, 1993, Appellant, then 17 years old, and Kevin Zenker ("Zenker") drove from Oil City to Donald Foust's residence. Appellant and Zenker stole one of Donald Foust's handguns and then returned to Oil City. While they were driving past Darla Bump's ("Bump's") and Russell Rice's ("Rice's") residence, Zenker fired at Bump's dog. Appellant turned the vehicle around and passed the residence again. Bump and Rice got in their vehicle and began following Appellant and Zenker. Eventually, Appellant slowed the car to a stop, grabbed the firearm, jumped out of the vehicle, approached Bump's and Rice's vehicle, and opened fired. Bump and Rice died from multiple gunshot wounds sustained during Appellant's assault.

## B. Procedural History

On February 1, 1994, the Commonwealth charged Appellant via criminal information with two counts of first-degree murder.[1] On May 13, 1994,

---

[1] 18 Pa.C.S.A. § 2502(a) (West 1994).

Appellant moved to transfer his case to the Juvenile Division of the Court of Common Pleas of Venango County. **See** 42 Pa.C.S.A. § 6355 (West 1994).[2] The trial court denied that motion on May 24, 1994, and trial commenced on June 22, 1994. Appellant was convicted of both counts of first-degree murder. On June 30, 2014, the trial court sentenced Appellant to two consecutive terms of LWOP. On direct appeal, this Court affirmed and our Supreme Court denied allowance of appeal. **Commonwealth v. Foust**, 667 A.2d 418 (Pa. Super. 1995) (unpublished memorandum), *appeal denied*, 672 A.2d 304 (Pa. 1995).

On January 5, 1998, Appellant filed his first *pro se* petition pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Counsel was appointed and the PCRA court held an evidentiary hearing. The PCRA court denied the petition on September 2, 1999. This Court affirmed the denial of relief and our Supreme Court denied allowance of appeal. **Commonwealth v. Foust**, 828 A.3d 397 (Pa. Super. 2003) (unpublished memorandum), *appeal denied*, 837 A.2d 1177 (Pa. 2003).

On July 9, 2010, Appellant filed his second *pro se* PCRA petition. On October 18, 2010, the PCRA court dismissed the petition. This Court affirmed and our Supreme Court denied allowance of appeal. **Commonwealth v. Foust**, 34 A.3d 217 (Pa. Super. 2011) (unpublished memorandum), *appeal*

---

[2] All statutory citations are to the current version of Purdon's Pennsylvania Statutes or Pennsylvania Consolidated Statutes Annotated unless otherwise noted.

- 3 -

*denied*, 34 A.3d 826 (Pa. 2011). Appellant filed his third *pro se* PCRA petition on July 16, 2012. Counsel was appointed and filed an amended petition. On June 25, 2014, the PCRA court dismissed the petition.[3]

On February 24, 2016, Appellant filed his fourth *pro se* PCRA petition, which he amended on March 28, 2016. In that petition, he argued that his LWOP sentences violated the Eighth Amendment of the United States Constitution as interpreted by **Miller v. Alabama**, 567 U.S. 460 (2012) and **Montgomery v. Louisiana**, 136 S.Ct. 718 (2016).[4] On May 12, 2016, the PCRA court granted the petition and vacated Appellant's judgment of sentence.[5]

Counsel then was appointed for resentencing. On July 5, 2016, the trial court sentenced Appellant to 30 years to life for each first-degree murder conviction and ordered those two sentences to run consecutively. Hence, the

---

[3] Appellant appealed the PCRA court's June 25, 2014 dismissal order. Appellant, however, discontinued the appeal before it was docketed in this Court. **See** Pa.R.A.P. 1973(b) ("If an appeal has not been docketed, the appeal may be discontinued in the lower court.").

[4] "The Eighth Amendment [of the United States] Constitution[ is] applicable to the States through the Due Process Clause of the Fourteenth Amendment[.]" **Baze v. Rees**, 553 U.S. 35, 47 (2008) (Roberts, C.J., opinion announcing the judgment of the court) (citation omitted).

[5] Although Appellant's petition was patently untimely, he satisfied the new constitutional rule exception to the PCRA's one-year time bar. **See** 42 Pa.C.S.A. § 9545(b)(1)(iii). Thus, the PCRA court had jurisdiction to reach the claim raised by Appellant.

trial court sentenced Appellant to an aggregate term of 60 years to life imprisonment. On July 15, 2016, Appellant challenged the legality of his sentence in a post-sentence motion. The trial court denied that motion on July 19, 2016. This timely appeal followed.[6]

### C. Questions Presented

Appellant presents two issues for our review:

1. Pursuant to [**Miller**, which invalidated] the Pennsylvania first and second[-]degree murder[7] statutes for juveniles, was the only constitutional sentence available a sentence for third[-]degree murder?

2. Is it unconstitutional to impose a sentence of 60 years to life, a *de facto* sentence of [LWOP], on a juvenile absent a finding that the juvenile is one of the rare and uncommon juveniles who is permanently incorrigible, irreparably corrupt[,] or irretrievably depraved?

Appellant's Brief at 3.[8]

## II. Discussion

---

[6] On July 28, 2016, the trial court ordered Appellant to file a concise statement of errors complained of on appeal ("concise statement"). **See** Pa.R.A.P. 1925(b). On September 1, 2016, Appellant filed a timely concise statement. On September 23, 2016, the trial court issued its Rule 1925(a) opinion. Both of Appellant's issues were included in his submission.

[7] For simplicity, references to "first-degree murder" shall include first-degree murder, first-degree murder of an unborn child, and first-degree murder of a law enforcement officer. Similarly, references to "second-degree murder" shall include second-degree murder, second-degree murder of an unborn child, and second-degree murder of a law enforcement officer.

[8] We have re-numbered the issues for ease of disposition.

Both of Appellant's issues challenge the legality of his sentence. We review the legality of a sentence *de novo* and our scope of review is plenary. ***Commonwealth v. Melvin***, 172 A.3d 14, 19 (Pa. Super. 2017) (citation omitted). To understand Appellant's challenges to the legality of his sentence, it is necessary to understand the statutory framework governing juveniles[9] convicted of first and second-degree murder.

### A. Legal Background

#### 1. Pennsylvania's Prior Statutory Scheme

At the time of Appellant's conviction, the Crimes Code provided that an individual, including a juvenile, convicted of first or second-degree murder must be sentenced to a term of life imprisonment. ***See*** 18 Pa.C.S.A. § 1102(a), (b) (West 1994). The Parole Code provided that an individual sentenced to a term of life imprisonment is not eligible for parole. ***See*** 61 Pa.C.S.A. § 6137(a)(1) (West 1994). Finally, the Juvenile Act provided that the term "delinquent act" does not include the crime of murder. ***See*** 42 Pa.C.S.A. § 6302 (West 1994).

Under that statutory framework, a juvenile who committed first or second-degree murder was charged as an adult. As occurred in the case *sub judice*, a defendant could then request that his or her case be transferred to

---

[9] We use the term juvenile to denote an individual under the age of 18 years old when he or she committed a crime. Thus, when we say a certain practice is barred for juvenile offenders, we mean that it is barred for individuals who were under 18 at the time of their offense, even if they were 18 or older when they were convicted and/or sentenced.

the Juvenile Division. **See** 42 Pa.C.S.A. § 6355 (West 1994). If the trial court refused to transfer the case to the Juvenile Division, and the juvenile was convicted of first or second-degree murder, the trial court had to sentence the juvenile to life imprisonment and the juvenile would never become eligible for parole. Thus, a juvenile convicted of first or second-degree murder under this statutory scheme received a mandatory LWOP sentence.

### 2. History of Punishment for Juvenile Offenders

Having set forth the statutory framework when Appellant was convicted and sentenced, we turn to the historical underpinnings of that statutory scheme.

When our Republic was founded, individuals over the age of 14 who were convicted of crimes were treated like adults and subject to execution. **See** Victor L. Streib, *Death Penalty for Children: The American Experience with Capital Punishment for Crimes Committed While Under Age Eighteen*, 36 Okla. L. Rev. 613, 614 (1983) ("Streib"). Individuals between the ages of seven and fourteen were presumed ineligible for the death penalty; however, this presumption was rebuttable. **See id.** Only children under the age of seven were ineligible for the death penalty. **See id.** Before 1900, at least 95 juveniles were executed. **See id.** at 616. At least 14 of these juveniles were executed for crimes committed when they were 14 or younger. **See id.** at 619.

In 1899, Illinois became the first state to separate the juvenile justice system from the criminal justice system. **See** 1899 Ill. Laws 131. Over the next four decades, almost every state and the federal government passed similar legislation, which treated some, or all, juvenile offenders differently than adult defendants. **E.g.** 1901 P.L. 279;[10] **see also** Streib at 616-617. This decreased the number of juveniles tried in the criminal justice system and imprisoned with adults; however, the most serious juvenile offenders were still treated as adults. Between 1900 and 1969, 192 juveniles were executed. **See id.** at 630. Between 1980 and 2005, 22 juveniles were executed. **See** Charles Lane, *5-4 Supreme Court Abolishes Juvenile Executions*, Wash. Post, Mar. 2, 2005 at A1.

Thus, for 363 years, from 1642, the time the first juvenile was executed in America, until 2005, it was constitutional to **execute** juveniles convicted of homicide. It naturally follows that all lesser sentences, including LWOP, were also constitutional for juveniles convicted of homicide. Only recently has the Supreme Court of the United States altered the law for the sentencing of juvenile offenders.

---

[10] This Court found the Act of May 21, 1901 unconstitutional in **Mansfield's Case**, 22 Pa. Super. 224 (1903). Later, our General Assembly enacted a constitutional statute which accomplished the same goals. **See** 1903 P.L. 274 (included in Purdon's at 11 P.S. §§ 71-141 (repealed)).

### 3. Supreme Court of the United States' Decisions

In the late 1980's, the jurisprudence of the Supreme Court of the United States regarding juvenile sentencing began to shift.

#### i. *Thompson v. Oklahoma*

The first major decision in this area was ***Thompson v. Oklahoma***, 487 U.S. 815 (1988). In **Thompson**, the Court explained that:

> The authors of the Eighth Amendment drafted a categorical prohibition against the infliction of cruel and unusual punishments, but they made no attempt to define the contours of that category. They delegated that task to future generations of judges who have been guided by the evolving standards of decency that mark the progress of a maturing society. In performing that task the Court has reviewed the work product of state legislatures and sentencing juries, and has carefully considered the reasons why a civilized society may accept or reject [a penalty] in certain types of cases.

*Id.* at 821-822 (Stevens, J., opinion announcing the judgment of the court) (internal quotation marks, citation, and footnotes omitted).

Pursuant to these views, the Court determined that a national consensus had formed against the imposition of the death penalty for juveniles under 16 years old. *Id.* at 823-833. In reaching this conclusion, the Court looked to how states treat juveniles in other areas, *e.g.*, at which age it is permissible to drive, vote, or purchase pornographic materials. *Id.* at 824-825. It also examined the legislation in states that barred capital punishment for individuals below a certain age and found that all of them forbade executing juveniles under the age of 16. *See id.* at 829. The Court then noted the rarity with which juries sentenced juveniles under 16 years old to death and

found this indicative of a national consensus against such a practice. **See id.** at 831-833. Finally, the Court found that juveniles are less culpable than adults when they commit heinous crimes and that the death penalty does not serve as a successful deterrent to individuals under 16 years old from committing homicide. **Id.** at 833-838. When it combined these factors, the Court determined that executing juveniles under the age of 16 violated society's evolving standards of decency. The Court, however, declined to reach the issue of whether executing 16- or 17-year old defendants violated the Eighth Amendment. **Id.** at 838.

### ii. *Stanford v. Kentucky*

Although **Thompson** did not reach the issue of whether executing 16- or 17-year old defendants violated the Eighth Amendment, the Court reached the issue one year later in **Stanford v. Kentucky**, 492 U.S. 361 (1989). In that case, it held that the execution of 16- or 17-year old defendants did not violate the Eighth Amendment. **Id.** at 369-380.

The Court first examined state statutes and noted that a majority of states which had the death penalty permitted execution of 16- or 17-year old defendants. **Id.** at 371-372. Next, the Court found that, although 16- and 17-year olds made up a small portion of death row, prosecutors were not hesitant to seek the death penalty and juries were not hesitant to impose the death penalty in cases involving such defendants. **Id.** at 373-374. The Court then addressed its analysis in **Thompson** related to the age necessary to

vote, drink alcohol, *etc*. It found it "absurd to think that one must be mature enough to drive carefully, to drink responsibly, or to vote intelligently, in order to be mature enough to understand that murdering another human being is profoundly wrong, and to conform one's conduct to that most minimal of all civilized standards." *Id.* at 374. The Court then rejected any attempt to establish a national consensus against executing 16- or 17-year old defendants based on "public opinion polls, the views of interest groups, and the positions adopted by various professional associations." *Id.* at 377.

Addressing the deterrence effect of capital punishment on 16- and 17-year olds, the Court held that a statute that does not deter crime would violate the Equal Protection Clause of the Fourteenth Amendment before it would violate the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 378. Alternatively, the Court found uncompelling the "socioscientific" evidence in support of the deterrence argument. *Id.* at 377-378. The Court also rejected the premise that it was for individual justices to determine if a punishment was cruel and unusual. *Id.* at 378-380. Instead, the Court emphasized that the key question was whether American society considered the punishment cruel and unusual. *See id.* Finally, the Court concluded that it could not invalidate a punishment without a national consensus that the punishment was cruel and unusual. As no such consensus existed regarding the execution of 16- or 17-year old defendants, the Court held the practice constitutional. *See id.* at 379-380.

### iii. *Roper v. Simmons*

Less than 16 years later, the Supreme Court of the United States reversed course, abrogated **Stanford**, and held that the Eighth Amendment of the United States Constitution forbade the execution of juvenile homicide offenders. **Roper v. Simmons**, 543 U.S. 551 (2005). The Court concluded that the national consensus regarding the execution of juvenile homicide offenders had shifted since **Stanford** and that the national consensus was now against that punishment. **Id.** at 564-567. It noted that, at that time, 18 states barred execution of juvenile homicide offenders, 12 barred the death penalty in its entirety, and 20 states permitted execution of juvenile homicide offenders. **Id.** at 564. The Court found a national consensus against execution of juvenile homicide offenders even though a majority of states that retained the death penalty also permitted the execution of juvenile homicide offenders. **See id.**

The Court next considered the socioscientific evidence that it rejected in **Stanford**. The Court held that "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders[,]" and, therefore, should not be subject to the harshest punishment available under the law. **Id.** at 569. The Court rejected **Stanford**'s reasoning that it is "absurd to think that one must be mature enough to drive carefully, to drink responsibly, or to vote intelligently, in order to be mature enough to understand that murdering

another human being is profoundly wrong, and to conform one's conduct to that most minimal of all civilized standards." *Stanford*, 492 U.S. at 374. Instead, the Court relied on these factors and included appendices to the opinion setting forth the state statutes governing these matters. *See Roper* 543 U.S. at 569 and 579.

The Court then abandoned *Stanford*'s reasoning that it was not for individual justices to determine if a punishment was cruel and unusual. *Id.* at 574-575. The Court concluded that *Thompson* and *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that executing mentally retarded individuals violated the Eighth Amendment, showed that it was the job of the courts to determine what punishments violate our nation's evolving standards of decency. *Roper*, 543 U.S. at 574-575.

Finally, the Court considered international law. It concluded that the consensus was that the death penalty for juvenile homicide offenders was cruel and usual. *Id.* at 575-578. It held that such international consensus could not be ignored in today's global society. *See id.* at 578. Combining international consensus with socioscientific evidence, the Court found that executing juvenile homicide offenders constituted cruel and unusual punishment. *See id.*

Notably, however, *Roper* endorsed sentencing juveniles to LWOP. Specifically, the Court held that "[t]o the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of

[LWOP] is itself a severe sanction, in particular for a young person." *Id.* at 572; *see id.* at 565 (noting with approval the decision of Kentucky's governor to commute Stanford's sentence to LWOP). Thus, LWOP was seen as an appropriate punishment for juvenile homicide offenders as recently as 12 years ago.

### iv. *Graham v. Florida*

The Supreme Court of the United States revisited its juvenile sentencing jurisprudence in *Graham v. Florida*, 560 U.S. 48 (2010), which considered whether LWOP sentences survived Eighth Amendment scrutiny when imposed on juvenile nonhomicide defendants. In *Graham*, the Court noted that 37 states, the District of Columbia, and the federal government all authorized LWOP sentenced for nonhomicide offenders. *Id.* at 62. Although evidence of state and federal legislation showed clearly and reliably a strong national consensus in favor of sentencing juveniles to LWOP for nonhomicide offenses, the Court held that "an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use." *Id.*

Next, the Court looked to the socioscientific evidence considered in *Roper* (but rejected in *Stanford*). This evidence showed that juvenile defendants are not as culpable as their adult counterparts. Thus, the Court held "that because juveniles have lessened culpability they are less deserving of the most severe punishments." *Id.* at 68. The Court also "recognized that

defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 69. Therefore, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." *Id.*

The Court then extensively detailed the consequences of being sentenced to LWOP. It stated that LWOP is

> the second most severe penalty permitted by law. It is true that a death sentence is unique in its severity and irrevocability, yet [LWOP] sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to [LWOP], but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence. . . . [T]his sentence means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he [or she] will remain in prison for the rest of his [or her] days.
>
> * * *
>
> [LWOP] is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender. A 16–year–old and a 75–year–old each sentenced to [LWOP] receive the same punishment in name only. This reality cannot be ignored.

*Graham*, 560 U.S. at 69-71.

The Court therefore held that "penological theory is not adequate to justify [LWOP] for juvenile nonhomicide offenders. This determination; the

- 15 -

limited culpability of juvenile nonhomicide offenders; and the severity of [LWOP] sentences all lead to the conclusion that" sentencing juveniles to LWOP for nonhomicide offenses violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* at 74. The Court's most directly relevant holding, for the issues we confront today, was that "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants [] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75.

### v. *Miller v. Alabama*

As noted above, *Graham* applied only to juvenile offenders convicted of nonhomicide offenses. Seven years later, however, the Court examined whether LWOP sentences for juvenile homicide offenders violated the Eighth Amendment. In *Miller*, the Court held that statutory schemes such as Pennsylvania's, which imposed mandatory LWOP for certain homicide convictions, constituted cruel and unusual punishment when applied to juvenile homicide offenders.

The Court began by reviewing the socioscientific evidence that it considered in *Roper* and *Graham*. It reaffirmed "that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, [] they are less deserving of the most severe punishments." *Id.* at 469 (internal

quotation marks and citation omitted). The Court next found that there was no reason to differentiate **Graham**, which addressed juvenile offenders convicted of nonhomicide offenses, from juveniles convicted of homicide offenses. Instead, the Court found that

> the mandatory penalty schemes at issue [in **Miller**] prevent the sentencer[11] from taking account of these [socioscientific] considerations. By removing youth from the balance—by subjecting a juvenile to the same [LWOP sentence] applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender.

**Id.** at 474. The Court thus held that a juvenile homicide defendant can only be sentenced to LWOP if he or she is permanently incorrigible, irreparably corrupt, or irretrievably depraved. **See id.** at 471, 473, 479-480 (citations omitted).

### vi. *Montgomery v. Louisiana*

After **Miller**, juvenile offenders who were sentenced to LWOP under prior statutory schemes began filing requests for collateral relief arguing that **Miller** applied retroactively.[12] In **Montgomery**, the Supreme Court of the

---

[11] Although in Pennsylvania, and most other jurisdictions, the trial court determines the appropriate sentence for a crime, in some states, juries can determine the appropriate sentence. For example, a defendant in Texas has the right to demand that the jury determine the appropriate sentence. **See Barrow v. State**, 207 S.W.3d 377, 380 (Tex. Crim. App. 2006).

[12] Our Supreme Court originally held that **Miller** did not apply retroactively to cases on collateral review. **Commonwealth v. Cunningham**, 81 A.3d 1, 9–11 (Pa. 2013).

United States held that ***Miller*** applies retroactively to cases on collateral review. ***Montgomery***, 136 S.Ct. at 732-737.

After setting forth the framework for determining if a new rule of constitutional law applies retroactively, ***see generally Teague v. Lane***, 489 U.S. 288 (1989) (O'Connor, J., opinion announcing the judgment of the court), the Court considered whether the rule announced in ***Miller*** was substantive or procedural in nature. If a new constitutional rule is substantive, it applies retroactively; however, if a new constitutional rule is procedural, it only applies retroactively if it is a watershed rule of criminal procedure. ***Montgomery***, 136 S.Ct. at 728 (citation omitted).

The Court held that the rule announced in ***Miller*** was substantive and not procedural in nature. ***Id.*** at 732-736. The Court reasoned that "[t]he foundation stone for ***Miller***'s analysis was [its] line of precedent holding certain punishments disproportionate when applied to juveniles." ***Id.*** at 732 (internal quotation marks and citation omitted). ***Miller***, therefore, expressly limited the circumstances under which a juvenile homicide offender may be sentenced to LWOP. ***Id.*** at 733-734. Hence, it "did more than require a sentencer to consider a juvenile offender's youth before imposing [LWOP.]" ***Id.*** at 734. Instead, it barred a category of punishment, LWOP, for a class of offenders, juvenile homicide offenders capable of rehabilitation. ***See id.*** The Court held that, "[t]o be sure, ***Miller***'s holding has a procedural component. . . . Those procedural requirements do not, of course, transform

substantive rules into procedural ones." ***Id.*** at 734-735. Accordingly, the Court held that ***Miller*** applied retroactively to cases on collateral review.

### 4. Statutory Reform

In response to ***Miller***, our General Assembly enacted 18 Pa.C.S.A. § 1102.1. ***See*** 2012 P.L. 1655. Section 1102.1 provides that an individual between the ages of 15 and 17 years old convicted of first-degree murder after June 24, 2012 must be sentenced to a maximum term of life imprisonment. 18 Pa.C.S.A. § 1102.1(a)(1). The minimum term of imprisonment for such an offender can be set anywhere from 35 years to life, *i.e.*, LWOP. ***See id.***

Section 1102.1 also provides that an individual under 15 years old convicted of first-degree murder after June 24, 2012 must be sentenced to a maximum term of life imprisonment. 18 Pa.C.S.A. § 1102.1(a)(2). The minimum term of imprisonment for such an offender can be set anywhere from 25 years to life, *i.e.*, LWOP. ***See id.***

Section 1102.1 provides that an individual between the ages of 15 and 17 years old convicted of second-degree murder after June 24, 2012 must be sentenced to a maximum term of life imprisonment. 18 Pa.C.S.A. §1102.1(c)(1). The minimum term of imprisonment for such an offender can be set anywhere from 30 years to life, *i.e.*, LWOP. ***See id.***

Section 1102.1 further provides that an individual under 15 years old convicted of second-degree murder after June 24, 2012 must be sentenced to

a maximum term of life imprisonment. 18 Pa.C.S.A. § 1102.1(c)(2). The minimum term of imprisonment for such an offender can be set anywhere from 20 years to life, *i.e.*, LWOP. ***See id.***

Under the current statutory framework, a juvenile who commits first or second-degree murder must be charged as an adult. A defendant can then request that his or her case be transferred to the Juvenile Division. ***See*** 42 Pa.C.S.A. § 6355. If the trial court refuses to transfer the case to the Juvenile Division, and the juvenile is convicted of first or second-degree murder, the trial court must sentence the juvenile to a maximum term of life imprisonment. Moreover, the mandatory minimum sentences set forth above apply only to juveniles convicted of first or second-degree murder after June 24, 2012. Section 1102.1 does not prescribe minimum sentences for juvenile homicide defendants who, like Appellant, were convicted of first or second-degree murder before June 24, 2012. Hence, the trial court had the discretion to sentence Appellant to any minimum sentence it considered appropriate.

### 5. Our Supreme Court's *Batts II* Decision

Although ***Miller*** held that a juvenile homicide offender may only be sentenced to LWOP if he or she is permanently incorrigible, irreparably corrupt, or irretrievably depraved, neither ***Miller*** nor ***Montgomery*** set forth procedural requirements for this determination. Moreover, after ***Miller***, many juvenile offenders who had been convicted of first or second-degree murder argued that trial courts lacked statutory authority to sentence them to a term

of life imprisonment. Our Supreme Court addressed these important issues

in **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017) ("**Batts II**").[13]

As for the latter issue, our Supreme Court held that:

> For those defendants for whom the sentencing court determines a [LWOP] sentence is inappropriate, it is our determination here that they are subject to a mandatory maximum sentence of life imprisonment as required by section 1102(a), accompanied by a minimum sentence determined by the common pleas court upon resentencing[.]

**Id.** at 421 (internal alteration, quotation marks, and citations omitted).[14]

Thus, our Supreme Court rejected Batts' argument that the trial court lacked

authority to impose life imprisonment.

A juvenile offender who challenges a LWOP sentence raises issues that

involve mixed questions of fact and law. **Id.** at 434-436. Because

**Montgomery** makes clear that a juvenile homicide offender may receive a

LWOP sentence only if he or she is found incapable of rehabilitation, such a

finding *ipso facto* implicates the trial court's authority to impose such a

sentence. **Id.** at 434-435. This threshold legal inquiry constitutes a pure

---

[13] Our Supreme Court referred to **Commonwealth v. Batts**, 66 A.3d 286 (Pa. 2013) as **Batts I**. Thus, although we only discuss the 2017 case, we refer to it as **Batts II** to be consistent with prior decisions of this Court.

[14] Section 1102 sets forth the mandatory sentence of life in prison for a defendant convicted of first- or second-degree murder. Our Supreme Court did not find that section 1102 is unconstitutional in light of **Miller**. Instead, it found that 61 Pa.C.S.A. § 6137(a)(1) (which prohibits parole for a defendant serving life imprisonment) is unconstitutional when applied to juvenile homicide offenders capable of rehabilitation. **See Batts II**, 163 A.3d at 421. Thus, section 1102 remains applicable to juveniles who were convicted of first- or second-degree murder prior to June 25, 2012.

question of law subject to *de novo* review. ***Id.*** at 435. To the extent, however, the determination is based on factual findings made by the trial court at the sentencing hearing, those findings are reviewed for an abuse of discretion. ***See id.*** at 435-436.

After deciding the merits of Batts' appeal, our Supreme Court "exercise[d its] constitutional power of judicial administration to devise a procedure for the implementation of the ***Miller*** and ***Montgomery*** decisions in Pennsylvania." ***Id.*** at 451 (internal quotation marks omitted). Our Supreme Court "conclude[d] that in Pennsylvania, a faithful application of the holding in ***Miller***, as clarified in ***Montgomery***, requires the creation of a presumption against sentencing a juvenile offender to [LWOP]." ***Id.*** at 452. The adoption of any other presumption would be contrary to "the central premise of ***Roper***, ***Graham***, ***Miller***[,] and ***Montgomery***—that as a matter of law, juveniles are categorically less culpable than adults." ***Id.***

Having determined that there is a presumption against juvenile LWOP sentences, our Supreme Court considered the burden of proof the Commonwealth must meet in order to establish that a juvenile offender is incapable of rehabilitation. It held that the Commonwealth must prove a juvenile is incapable of rehabilitation beyond a reasonable doubt. ***Id.*** at 452-455. Our Supreme Court reasoned that "[t]he risk of an erroneous decision against the offender would result in the irrevocable loss of that liberty for the rest of his or her life." ***Batts II***, 163 A.3d at 454. Moreover, our Supreme

- 22 -

Court found that "an erroneous decision in favor of the offender . . . carries minimal risk; if the juvenile offender is one of the very rare individuals who is incapable of rehabilitation, he or she simply serves the rest of the life sentence without ever obtaining release on parole." *Id.* Our Supreme Court held that the only evidentiary burden which properly balanced these interests was that of proof beyond a reasonable doubt. *See id.* at 455 (reading *Miller* and *Montgomery* to require "near certainty" in the finding that a juvenile is incapable of rehabilitation). Our Supreme Court also held that the Commonwealth must provide "reasonable notice to the defendant" if it seeks to pursue a LWOP sentence. *Id.*

Batts argued that the Commonwealth needed to produce expert testimony to satisfy its burden of proof. Although declining to impose such a requirement, our Supreme Court warned that, "it is difficult to conceive of a case where the Commonwealth would not proffer expert testimony and where the sentencer would not find expert testimony to be necessary." *Id.* at 456.

Batts also argued, that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 133 S.Ct. 2151 (2013), the finding that a juvenile offender is incapable of rehabilitation must be made by a jury. Our Supreme Court rejected this argument and noted that the Supreme Court of the United States held "that the decision of whether to sentence a juvenile to [LWOP] could be made by a judge." *Batts II*, 163 A.3d at 456, *citing* *Montgomery*, 136 S.Ct. at 733. Our Supreme Court also rejected Batts'

- 23 -

contention that all appeals from juvenile LWOP sentences should be taken directly to our Supreme Court. Instead, the court held that it lacked jurisdiction to promulgate such a rule. *See id.* at 457. With this legal background in mind, we turn to Appellant's challenges to the legality of his sentence.

### B. Invalidity of First and Second-Degree Murder Statutes

In his first issue, Appellant argues that, because *Miller* rendered Pennsylvania's prior statutory scheme unconstitutional, his sentence is illegal. According to Appellant, because there was no valid statutory scheme to prescribing his sentence for first-degree murder, the trial court had to sentence him under the scheme for third-degree murder. Therefore, Appellant argues that he was only subject to a maximum sentence of 20 years' imprisonment. As counsel for Appellant correctly noted at oral argument, our Supreme Court's decision in *Batts II* makes clear that the trial court was required to sentence Appellant, who was convicted of first-degree murder, to a maximum term of life imprisonment. *Commonwealth v. Seskey*, 170 A.3d 1105, 1106 (Pa. Super. 2017) (footnote omitted); *Batts II*, 163 A.3d at 421. In other words, there was valid statutory authority to impose a maximum sentence of life imprisonment for Appellant's first-degree murder conviction. Accordingly, Appellant is not entitled to relief on his first claim of error.

### C. *De Facto* Life Sentence Claim

In his second issue, Appellant argues that his sentence is illegal because a term of 60 years to life imprisonment is a *de facto* LWOP sentence. Appellant contends that, under **Miller** and **Batts II**, a *de facto* LWOP sentence for a juvenile homicide offender is unconstitutional unless the trial court finds that the Commonwealth proved, beyond a reasonable doubt, that the juvenile offender is incapable of rehabilitation. Here, the trial court explicitly found that Appellant is capable of rehabilitation. N.T., 7/5/16, at 166-169. Therefore, we must determine whether, under such circumstances, *de facto* LWOP sentences are barred by **Miller** and, if they are, whether Appellant's sentence constitutes an unlawful punishment.

### 1. Constitutionality of *De Facto* Life Sentences

The Supreme Court of the United States, our Supreme Court, and this Court have not decided whether *de facto* LWOP sentences are constitutional under **Miller** when the trial court finds that the defendant is capable of rehabilitation. Similarly, the Supreme Court of the United States, our Supreme Court, and this Court have not determined whether, in light of **Graham**, *de facto* LWOP sentences are permitted for juveniles convicted of nonhomicide offenses.[15] Courts in other jurisdictions have addressed these

---

[15] In the present circumstances, cases addressing **Graham** are equally as applicable and persuasive as those addressing **Miller**. **Graham** categorically barred LWOP sentences for juvenile nonhomicide offenders, while **Miller** placed the same categorical bar on juvenile homicide offenders unless the trial court finds that the juvenile is incapable of rehabilitation. We are not persuaded that the required finding in **Miller** means that *de facto* LWOP

issues, as well as related questions such as whether the validity of a sentence turns on the aggregate punishment imposed or focuses upon the separate punishments issued for multiple offense. Our analysis thus considers the constitutionality of *de facto* LWOP sentences, together with the propriety of the punishment imposed in this case, with a view toward the emerging body of relevant and persuasive case law.

After careful consideration, we hold that a trial court may not impose a term-of-years sentence, which constitutes a *de facto* LWOP sentence, on a juvenile offender convicted of homicide unless it finds, beyond a reasonable doubt, that he or she is incapable of rehabilitation. In **Miller**, the Supreme Court of the United States held that states must provide a juvenile convicted of a homicide offense a meaningful opportunity to obtain release based on

---

sentences for juvenile homicide offenders capable of rehabilitation are more appropriate than *de facto* LWOP sentences for juvenile nonhomicide offenders. We likewise cannot construct a viable argument for why to treat them differently.

The threshold question under both **Graham** and **Miller**, and one we answer here, is whether a term-of-years sentence that appears to exceed a juvenile defendant's life expectancy constitutes a *de facto* LWOP sentence that entitles the defendant to protection under **Graham** and **Miller**. In other words, the threshold issue is the same under both **Graham** and **Miller**. Only after the threshold issue is resolved does the analysis under **Miller** differ from the analysis under **Graham**. Under **Miller** and **Batts II**, a LWOP sentence is constitutional if, and only if, the trial court finds, beyond a reasonable doubt, that the juvenile homicide defendant is incorrigible. Under **Graham**, a LWOP sentence may never be imposed on a nonhomicide juvenile offender. For these reasons, **Graham**, and its progeny, are highly relevant and persuasive in examining whether lengthy term-of-years or *de facto* LWOP sentences remain lawful punishments for juvenile offenders.

demonstrated maturity and rehabilitation unless the sentencing authority finds that the juvenile is incapable of rehabilitation. *See Miller*, 569 U.S. at 479, *citing Graham*, 560 U.S. at 75.

At the time of the *Miller* decision, Alabama, along with Pennsylvania and many other states, required sentencing authorities to impose LWOP sentences upon juvenile homicide offenders. Thus, in *Miller*, the Supreme Court of the United States confronted a case in which the juvenile was sentenced to a *de jure* LWOP sentence instead of a *de facto* LWOP sentence. The Court, therefore, could have omitted the language regarding a juvenile having a meaningful opportunity for release if it so chose. It could have simply stated that *de jure* LWOP sentences violate the Eighth Amendment when imposed on juveniles capable of rehabilitation. Instead, it broadly stated that juveniles are entitled to a meaningful opportunity for release. We find this to be a strong indication that the Supreme Court of the United States was more focused on the practical realities of a sentence than the name assigned to a sentence. *See State ex rel. Morgan v. State*, 217 So.3d 266, 273 (La. 2016); *Casiano v. Commissioner of Correction*, 115 A.3d 1031, 1047 (Conn. 2015), *cert. denied*, 136 S.Ct. 1364 (2016); *Henry v. State*, 175 So.3d 675, 679 (Fla. 2015), *cert. denied*, 136 S.Ct. 1455 (2016).

Courts should not circumvent the prohibition on LWOP sentences by imposing lengthy term-of-years punishments that equate to the unlawful sanction. *See State v. Moore*, 76 N.E.3d 1127, 1140 (Ohio 2016), *cert.*

*denied*, 138 S.Ct. 62 (2017) (A sentencer "that imposed an unconstitutional [LWOP] sentence on a juvenile offender [cannot] correct Eighth Amendment deficiencies upon remand by resentencing the defendant to a term-of-years sentence when parole would be unavailable until after the natural life expectancy of the defendant[.]"); *McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016). As lengthy term-of-years sentences that constitute *de facto* LWOP punishments attempt such circumvention, like *de jure* LWOP sentences, they constitute cruel and unusual punishments barred by the Eighth Amendment when imposed on juvenile offenders.

Permitting *de facto* LWOP sentences for juvenile homicide offenders capable of rehabilitation but prohibiting *de jure* LWOP sentences for the same class of offenders places form over substance. *See State v. Zuber*, 152 A.3d 197, 211 (N.J. 2017), *cert. denied*, 138 S.Ct. 152 (2017) ("It does not matter to the juvenile whether he faces formal [LWOP] or multiple term-of-years sentences that, in all likelihood, will keep him in jail for the rest of his life. We believe it does not matter for purposes of [*Graham* or *Miller*.]"); *Morgan*, 217 So.3d at 274; *People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016); *Bear Cloud v. State*, 334 P.3d 132, 143 (Wyo. 2014); *State v. Null*, 836 N.W.2d 41, 72 (Iowa 2013).

As the United States Supreme Court has often noted in criminal cases, "form is not to be exalted over substance." *Blueford v. Arkansas*, 566 U.S. 599 (2012), *quoting Sanabria v. United States*, 437 U.S. 54, 66 (1978);

*Barefoot v. Estelle*, 463 U.S. 880, 892 (1983), *superseded by statute on other grounds*, 28 U.S.C. § 2253; *United States v. DiFrancesco*, 449 U.S. 117, 142 (1980) (citations omitted); *Escobedo v. Illinois*, 378 U.S. 478, 486 (1964). Similarly, our Supreme Court and this Court routinely refuse to place form over substance in criminal matters. *Commonwealth v. Marshall*, 810 A.2d 1211, 1218 (Pa. 2002) (Zappala, C.J., opinion announcing the judgment of the court), *citing Commonwealth v. Jermyn*, 533 A.2d 74, 87 (Pa. 1987); *Commonwealth v. Kunish*, 602 A.2d 849, 851 n.2 (Pa. 1992); *Commonwealth v. Farrow*, 168 A.3d 207, 219 (Pa. Super. 2017); *Commonwealth v. Perrin*, 108 A.3d 50, 53 (Pa. Super. 2015) (citation omitted). We again refuse to place form over substance when determining if a juvenile capable of rehabilitation will ever have the chance to walk free.

Finally, we note that this holding is consistent with the tide of decisions by the Supreme Court of the United States regarding juvenile sentencing. As we have detailed at length above, for the past several decades the Court has dramatically shifted our nation's jurisprudence in this area. As recently as 1987, it was permissible to execute an individual under 16 years old. Beginning with *Thompson* in 1988, the Court quickly outlawed execution for juveniles under 16, execution for all juveniles in *Roper*, LWOP for nonhomicide juvenile offenders in *Graham*, and finally mandatory LWOP for juvenile homicide offenders in *Miller*. Thus, the clear trend is to limit the maximum penalty to which juvenile offenders are exposed. Finding *de facto*

LWOP sentences unconstitutional under **Graham** and **Miller** is consistent with this trend. For all the above stated reasons, we hold that a trial court may not impose a term-of-years sentence on a juvenile convicted of homicide if that term-of-years sentence equates to a *de facto* LWOP sentence unless it finds, beyond a reasonable doubt, that the juvenile is incapable of rehabilitation.

We find unpersuasive the reasoning of courts which have upheld *de facto* LWOP sentences under **Graham** or under **Miller** for juvenile defendants capable of rehabilitation.[16] **See State v. Nathan**, 522 S.W.3d 881 (Mo. 2017); **State v. Ali**, 895 N.W.2d 237 (Minn. 2017), *cert. denied*, 2018 WL 311461 (U.S. Jan. 8, 2018); **Lucero v. People**, 394 P.3d 1128 (Colo. 2017), *cert. denied*, 2018 WL 311464 (U.S. Jan. 8, 2018); **Vazquez v. Commonwealth**, 781 S.E.2d 920 (Va. 2016), *cert. denied*, 137 S.Ct. 568 (2016); **Brown v. State**, 10 N.E.3d 1 (Ind. 2014); **Diamond v. State**, 419 S.W.3d 435, 440 (Tex. App. 2012). These decisions focused on the specific

---

[16] Many of these courts cited the United States Court of Appeals for the Sixth Circuit's decision in **Bunch v. Smith**, 685 F.3d 546 (6th Cir. 2012), *cert. denied*, 569 U.S. 947 (2013). **Bunch**, however, was a federal *habeas corpus* case brought under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, relief may only be granted if the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." **Kernan v. Cuero**, 138 S.Ct. 4, 5 (2017) (*per curiam*), *quoting* 28 U.S.C. § 2254(d)(1). Hence, we find **Bunch** inapposite when considering the question presented in this case. **Cf. Virginia v. LeBlanc**, 137 S.Ct. 1726 (2017) (*per curiam*) (holding that geriatric release program in Virginia does not violate clearly established federal law as announced in **Graham**).

holdings in *Graham* and *Miller*. Those courts noted that, because of the factual scenarios presented in *Graham* and *Miller*, the Court invalidated only LWOP sentences for juveniles convicted of nonhomicide offenses and juvenile homicide offenders capable of rehabilitation. Thus, those courts found that *de facto* LWOP sentences are not barred by *Graham* and *Miller*. In other words, because the *Graham* and *Miller* decisions were not directly on point, the courts refused to apply the decisions in those cases.

We do not believe that is the appropriate standard in the case *sub judice*. When interpreting decisions of the Supreme Court of the United States, our Supreme Court, and this Court apply the "logical inference[s]" of those decisions. *Commonwealth v. Flowers*, 113 A.3d 1246, 1249 (Pa. Super. 2015); *see Norton v. Glenn*, 860 A.2d 48, 54 (Pa. 2004). In other jurisdictions, courts are sometimes reluctant to extend the reach of decisions of the Supreme Court of the United States, even when the inference of the decisions is clear. In Pennsylvania, however, both our Supreme Court and this Court faithfully execute the United States Supreme Court's decisions – including the logical inferences thereof. *See Batts II* 163 A.3d at 455 (applying the logical inferences of *Miller* and *Montgomery*). Thus, we find those cases which narrowly construed the holdings in *Graham* and *Miller*, and rejected their logical inferences, unpersuasive. Accordingly, we hold that *de facto* life sentences are cruel and unusual punishment when imposed on

juveniles convicted of nonhomicide offenses or juvenile homicide offenders capable of rehabilitation.

### 2. Consideration of Aggregate Sentence

Having determined that *de facto* LWOP sentences are barred by **Miller** if, as in the case at bar, the trial court fails to find that the juvenile homicide defendant is incapable of rehabilitation, we next evaluate Appellant's sentence to determine if he received a *de facto* LWOP sentence. As noted above, Appellant received 30 years to life imprisonment for each of two counts of first-degree murder and the trial court ordered those sentences to run consecutively. Hence, he received an aggregate term of 60 years to life imprisonment. Appellant, who conceded at oral argument that the sentences for the individual homicide counts in this case are constitutional, argues that we must look at the aggregate sentence when determining if he received a *de facto* LWOP sentence. Put differently, Appellant argues that we must consider whether a sentence of 60 years to life constitutes a *de facto* LWOP sentence. The Commonwealth argues that we must examine each individual sentence separately. In other words, the Commonwealth argues that we must consider whether a sentence of 30 years to life constitutes a *de facto* LWOP sentence.

Neither the Supreme Court of the United States nor our Supreme Court has addressed this issue.[17] That said, this issue has arisen in our sister states

---

[17] We disagree with the Supreme Court of Nevada's decision that this silence implicitly means that we must consider the aggregate sentence. ***See State***

where courts reached differing conclusions on whether individual sentences or the aggregate sentence determine the presence of a *de facto* LWOP sentence. *Compare McCullough v. State*, 168 A.3d 1045, 1065-1070 (Md. Spec. App. 2017), *appeal granted*, 171 A.3d 612 (Md. 2017) (individual); *Morgan*, 217 So.3d at 271 (same); *State v. Kasic*, 265 P.3d 410 (Ariz. App. 2011) (same) *with Zuber*, 152 A.3d at 212 (aggregate); *State v. Ramos*, 387 P.3d 650, 660 (Wash. 2017), *cert. denied*, 138 S.Ct. 467 (2017) (same); *Moore*, 76 N.E.3d at 1141-1143 (same); *Reyes*, 63 N.E.3d at 888 (same); *State v. Boston*, 363 P.3d 453, 457 (Nev. 2015) (same); *Henry*, 175 So.3d at 679-680 (same); *Null*, 836 N.W.2d at 73-74 (same); *Bear Cloud*, 334 P.3d at 1143 (same); *People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (same). After careful consideration of this persuasive authority, together with this Commonwealth's sentencing jurisprudence, we hold that, when considering the constitutionality of a sentence, the individual sentences must be considered when determining if a juvenile received a *de facto* LWOP sentence.

We begin by examining Pennsylvania jurisprudence regarding sentencing for multiple convictions. It is well settled that "imposition of consecutive rather than concurrent sentences rests within the trial court's discretion." *Commonwealth v. Harvard*, 64 A.3d 690, 703 (Pa. Super. 2013), *appeal denied*, 77 A.3d 636 (Pa. 2013) (citation omitted). Moreover,

---

*v. Boston*, 363 P.3d 453, 457 (Nev. 2015). Instead, it requires us to undertake the analysis set forth in this opinion.

extensive case law in this jurisdiction holds that defendants convicted of multiple offenses are not entitled to a "volume discount" on their aggregate sentence. ***Commonwealth v. Green***, 149 A.3d 43, 54 (Pa. Super. 2016), *appeal denied*, 168 A.3d 1255 (Pa. 2017) (citation omitted); ***Commonwealth v. Brown***, 145 A.3d 184, 188 (Pa. Super. 2016), *appeal denied*, 165 A.3d 892 (Pa. 2017) (citation omitted); ***Commonwealth v. Bonner***, 135 A.3d 592, 605 (Pa. Super. 2016), *appeal denied*, 145 A.3d 161 (Pa. 2016) (citations omitted); ***Commonwealth v. Swope***, 123 A.3d 333, 341 (Pa. Super. 2015) (citation omitted); ***Commonwealth v. Zirkle***, 107 A.3d 127, 134 (Pa. Super. 2014), *appeal denied*, 117 A.3d 297 (Pa. 2015).

Pennsylvania courts have considered aggregate sentences only when reviewing discretionary sentencing determinations. Those cases are, however, easily distinguishable from the present circumstances. For example, in ***Commonwealth v. Dodge***, 957 A.2d 1198 (Pa. Super. 2008), *appeal denied*, 980 A.2d 605 (Pa. 2009), the defendant was sentenced to an aggregate term of approximately 52½ to 111 years' imprisonment for 37 burglary convictions. This Court vacated the sentence finding that imposition of serial consecutive terms was clearly unreasonable and that the trial court abused its discretion in imposing the sentence. ***Id.*** at 1202. In other words, this Court granted relief on Dodge's challenge to the discretionary aspects of his sentence. ***See id.*** This Court did not treat Dodge's claim as an attack on the legality of his sentence. Thus, ***Dodge*** and similar cases suggest strongly

that Pennsylvania law considers the aggregate term of a sentence only when the discretionary aspects of multiple punishments are under review.[18]  In this case, Appellant asks us to declare unlawful the trial court's discretionary determination to impose consecutive (but independently valid) punishments for a double murder conviction under principles of the Eighth Amendment. This position enjoys no support under Pennsylvania law and runs contrary to decisions that have previously addressed the claim.  *Cf. Kasic*, 265 P.3d at 415 (Because defendants have no constitutional right to have their sentences for separate offenses run concurrently, if a sentence for a particular offense is constitutional, it does not become unconstitutional "merely because it is consecutive to another sentence for a separate offense or because the

---

[18] We believe that the Supreme Court of Iowa and the Supreme Court of Ohio's rationales for considering a defendant's aggregate sentence are flawed.  Those courts relied on the fact that the defendants in *Miller* and *Graham* were convicted of multiple crimes, yet the Supreme Court of the United States did not address that fact.  *See Moore*, 76 N.E.3d at 1141-1142 (addressing claim that 112-year sentence for multiple nonhomicide offenses violated *Graham*); *Null*, 836 N.W.2d at 73 (addressing claim that a lengthy prison term for one homicide and one nonhomicide offense violated *Graham* and *Miller*).  The United States Supreme Court did not address the issue in *Miller* and *Graham* because the defendants in those cases were sentenced to LWOP for a single homicide and nonhomicide offenses respectively.  Thus, their sentences for the other offenses were immaterial to its decisions.  As for the decisions to grant, vacate, and remand ("GVR") cases after *Miller*, a GVR for consideration in light of a recent Supreme Court of the United States decision is not a merits determination.  *See Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001).  Instead, it is merely directing the lower court to consider the case anew given the recent decision.  *See Lawrence ex rel. Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (*per curiam*).  Thus, nothing in *Miller* or *Graham*, or the GVRs that followed, indicate that we must consider the aggregate sentence instead of the individual sentences.

consecutive sentences are lengthy in [the] aggregate."). We reject Appellant's effort to invalidate the legality of his sentence under principles traditionally confined to discretionary sentencing review.

Adoption of Appellant's view would not only abandon well-settled rules of Pennsylvania sentencing law, it would open the door to volume sentencing discounts in cases involving multiple juvenile homicide offenses. Juvenile perpetrators convicted of multiple homicides would routinely be subject to concurrent terms of imprisonment if the Commonwealth was unable to sustain its burden of proof under *Miller* and *Batts II* and juvenile offenders would receive volume discounts for their crimes. As noted above, if Appellant committed these murders after June 24, 2012, he would have been subject to a 35-year mandatory minimum sentence. 18 Pa.C.S.A. § 1102.1(a)(1). The trial court sentenced Appellant to a shorter term of imprisonment for each homicide because of its determination that he was capable of rehabilitation. Now, Appellant seeks an even further reduction in the sentence imposed for each homicide offense.

We recognize the rationale in *Roper, Graham*, and *Miller* regarding the decreased deterrent effect that accompanies harsher punishments for juveniles. *See Miller*, 567 U.S. at 472, *citing Graham*, 560 U.S. at 72; *Roper*, 543 U.S. at 571. This rationale, however, is limited to the maximum possible penalty for an offense. Contrary to the arguments made by Appellant at oral argument, there is nothing in *Roper*, *Graham*, and/or *Miller* that

speaks to volume discounts for multiple crimes. As discussed above, Pennsylvania has long disavowed the concept of volume discounts for committing multiple crimes.

*Roper*, *Graham*, and *Miller* all were based, at least in part, on a national consensus against a class of punishment, *e.g.*, LWOP for juvenile homicide offenders capable of rehabilitation. The United States Supreme Court has never found such a consensus against the imposition of consecutive term-of-years sentences for multiple offenses. We are similarly unaware of any movement by states to ban the practice. Again, consecutive imposition of independently valid punishments is a distinctly discretionary function of the sentencing authority. Although some courts have found that the practice violates *Graham* and *Miller*, this differs from an organic, state-level determination that the practice is cruel and unusual. Thus, the foundations of *Roper*, *Graham*, and *Miller*, the national consensus against a class of punishment, is lacking with respect to imposing consecutive term-of-years sentences for multiple offenses. *Cf. Thompson*, 487 U.S. at 821-822 (explaining that the Court looks to organic state-level developments when deciding if a sentence is cruel and unusual).

We find persuasive the reasoning of the Court of Special Appeals of Maryland in *McCullough*. As the *McCullough* court astutely noted, *Miller*'s other lynchpin is that it is inappropriate for a state legislature to make a categorical, irrevocable judgment about a juvenile homicide offender's

potential for rehabilitation. ***McCullough***, 168 A.3d at 1067. When a trial court imposes multiple term-of-years sentences, it is not making such a determination. Instead, it is making a series of determinations about what the appropriate sentence is for each offense. Barring trial courts from running such sentences consecutively would strip them of their traditional, statutory duty to make such determinations regarding each offense committed. ***See*** 42 Pa.C.S.A. § 9721(a).

We also agree with the ***McCullough*** court that permitting consecutive term-of-years sentences "is not a same sentence different label situation." ***McCullough***, 168 A.3d at 1069. As noted above, we refuse to place form over substance with respect to *de facto* LWOP sentences. Imposing consecutive term-of-years sentences for multiple offenses, however, is not placing form over substance. To the contrary, such punishments consider the substance of each individual sentence.[19] For this reason, the Supreme Court

---

[19] We also find persuasive the dicta from ***O'Neil v. Vermont***, 144 U.S. 323 (1892), relied on by the Special Court of Appeals of Maryland. In that case, the defendant was sentenced to an aggregate term of over 54 years' imprisonment for selling liquor without a license. On appeal to the Supreme Court of Vermont, he argued that the sentence violated the Eighth Amendment of the United States Constitution. The Supreme Court of Vermont upheld the sentence and the defendant sought review by the Supreme Court of the United States. The Court held that it lacked jurisdiction over the case because the defendant failed to raise the Eighth Amendment claim in his petition for review. The Court found that the Supreme Court of Vermont's decision rested on independent and sufficient state law grounds as to the question presented in the petition for review. Hence, it raised no question of federal law. ***See id.*** at 335-337.

of New Jersey's reasoning for examining the aggregate sentence is flawed.

*See Zuber*, 152 A.3d at 212 (concluding that a court must examine the

practical realities of aggregate sentences).

    We disagree with the reasoning of those courts that have examined the

aggregate sentence instead of the individual sentences. Determining whether

---

Nonetheless, the Court quoted the Supreme Court of Vermont's disposition of the cruel and unusual punishment issue:

> It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life. The mere fact that cumulative punishments may be imposed for distinct offenses in the same prosecution is not material upon this question. If the penalty were unreasonably severe for a single offense, the constitutional question might be urged; but here the unreasonableness is only in the number of offenses which the respondent has committed.

*Id.* at 331, *quoting State v. Four Jugs of Intoxicating Liquor*, 2 A. 586, 593 (Vt. 1886). The Court of Special Appeals of Maryland noted that "the *O'Neil* Court's dicta has been widely followed by state and federal courts in assessing proportionality challenges under the Eighth Amendment." *McCullough*, 168 A.3d at 1068 (collecting cases).

Justices Field, Harlan, and Brewer dissented from *O'Neil*. *See id.* at 337-366 (Field, J., dissenting); *id.* at 366-371 (Harlan, J., dissenting). In their view, it was the aggregate sentence which controlled for purposes of the Eighth Amendment. These lengthy dissents evidence that these three justices, who were present during conference and presumably understood the majority opinion, believed that the majority in *O'Neil* was quoting the passage from the Supreme Court of Vermont with approval. Although, as noted above, the Court dismissed the case on jurisdictional grounds, it is axiomatic that "dicta of the [Supreme Court of the United States] should be very persuasive." *Gabbs Expl. Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963) (internal quotation marks and citation omitted).

the crimes occurred in one course of conduct or separate courses of conduct is an unworkable standard and is immaterial for Eighth Amendment purposes. *But see Reyes*, 63 N.E.3d at 888 (implicitly employing this rationale). For the same reason, examining whether sentences were imposed at one sentencing hearing or multiple sentencing hearings is inappropriate. *But see Moore*, 725 F.3d at 1193 (concluding that this is the dispositive factor of whether to consider the individual sentences or the aggregate sentence).

In our view, whether the aggregate or individual sentences control for purposes of *Miller* is the most difficult question raised in this appeal. We have scrutinized relevant Pennsylvania case law, prior decisions of the Supreme Court of the United States, and persuasive authority from other jurisdictions. Although we acknowledge that there is ground for differing views, we believe that we are on sound legal footing and consistent with Pennsylvania law. Accordingly, we hold that we must consider the individual sentences, not the aggregate, to determine if the trial court imposed a term-of-years sentence which constitutes a *de facto* LWOP sentence.

### 3. Facts of This Case

Having determined that we must examine Appellant's two sentences for first-degree murder separately, we turn to whether a sentence of 30 years to life imprisonment constitutes a *de facto* LWOP sentence. At oral argument, Appellant's counsel conceded that a sentence of 30 years to life imprisonment does not violate *Miller*. Instead, she stressed the consecutive nature of the

- 40 -

two sentences in this case requires vacatur of Appellant's punishment. The Commonwealth similarly argued that a sentence of 30 years to life does not violate *Miller*. We agree.

There are certain term-of-years sentences which clearly constitute *de facto* LWOP sentences. For example, a 150-year sentence is a *de facto* LWOP sentence. Similarly, there are clearly sentences which do not constitute *de facto* LWOP sentences. A sentence of 30 years to life falls into this category. We are unaware of any court that has found that a sentence of 30 years to life imprisonment constitutes a *de facto* LWOP sentence for a juvenile offender. Even the study with the shortest life expectancy for an offender in Appellant's position places his life expectancy at 49 years, *i.e.*, beyond 30 years. ***See*** Appellant's Brief at 16, *citing* **Casiano**, 115 A.3d at 1046.

We explicitly decline to draw a bright line in this case delineating what constitutes a *de facto* LWOP sentence and what constitutes a constitutional term-of-years sentence. ***But see Commonwealth v. Dodge***, 77 A.3d 1263, 1276 (Pa. Super. 2013), *appeal denied*, 91 A.3d 161 (Pa. 2013) (appearing to hold that a defendant must be parole eligible before he or she turns 90 for it not to be considered a *de facto* LWOP sentence). We similarly decline to set forth factors that trial courts must consider when making this determination, *i.e.*, whether they must look to the life expectancy of the population as a whole or a subset thereof and whether the defendant must be given a chance at a meaningful post-release life. We need not confront these difficult questions

in this case. Instead, we limit our holding to the facts of this case. A sentence of 30 years to life imprisonment does not constitute a *de facto* LWOP sentence which entitles a defendant to the protections of **Miller**.

### D. Discretionary Aspects of Sentencing Claim

Having determined that Appellant's sentence is constitutional and, therefore, not an illegal sentence, we turn to Appellant's alternative argument that the trial court abused its discretion in sentencing him to two consecutive terms of incarceration of 30 years to life. Pursuant to statute, Appellant does not have an automatic right to appeal the discretionary aspects of his sentence. **See** 42 Pa.C.S.A. § 9781(b). Instead, Appellant must petition this Court for permission to appeal the discretionary aspects of his sentence. **Id.**

As this Court has explained, in order to reach the merits of a discretionary aspects claim,

> we must engage in a four part analysis to determine: (1) whether the appeal is timely; (2) whether Appellant preserved his [or her] issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the [S]entencing [C]ode.

**Commonwealth v. Machicote**, 172 A.3d 595, 602 (Pa. Super. 2017) (citation omitted). Appellant filed a timely notice of appeal, preserved the issue in his post-sentence motion, and included a Pennsylvania Rule of Appellate Procedure 2119(f) statement in his appellate brief. Thus, we turn to whether Appellant raises a substantial question.

J-A21018-17

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." **Commonwealth v. Battles**, 169 A.3d 1086, 1090 (Pa. Super. 2017) (citation omitted). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Commonwealth v. Grays**, 167 A.3d 793, 816 (Pa. Super. 2017) (citation omitted).

In his Rule 2119(f) statement, Appellant argues that this case presents a substantial question because imposing consecutive sentences for the two murder convictions was clearly unreasonable and results in an excessive sentence. This argument presents a substantial question. *See* **Commonwealth v. Dodge**, 77 A.3d 1263, 1270 (Pa. Super. 2013), *appeal denied*, 91 A.3d 161 (Pa. 2014). Accordingly, we proceed to analyze the merits of Appellant's discretionary aspects challenge.

"Sentencing is a matter vested in the sound discretion of the [trial court], and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." **Commonwealth v. Barnes**, 167 A.3d 110, 122 (Pa. Super. 2017) (*en banc*) (citation omitted). Pursuant to statute,

> the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S.A. § 9721(b). "The [trial] court is not required to parrot the words of the Sentencing Code, stating every factor that must be considered under Section 9721(b), however, the record as a whole must reflect due consideration by the court of the statutory considerations at the time of sentencing." *Commonwealth v. Bullock*, 170 A.3d 1109, 1126 (Pa. Super. 2017) (internal alterations, quotation marks, and citation omitted).

Typically, when sentencing a defendant, the trial court is required to consider the sentencing guidelines. *Commonwealth v. Melvin*, 172 A.3d 14, 21 (Pa. Super. 2017) (citation omitted). In this case, however, no sentencing guidelines exist for juveniles convicted of first-degree murder prior to June 25, 2012. *See id.* at 22. Instead, our Supreme Court in *Batts II* held that, in these cases, the applicable "sentencing guidelines" that the trial court should consider are the mandatory minimum penalties set forth in section 1102.1. *See Batts II*, 163 A.3d at 443 n.17.

When explaining its sentence, the trial court detailed its extensive review of the record in this case. The trial court read the gut-wrenching victim impact statements from the original sentencing hearing on June 30, 1994. *See* N.T., 7/5/16, at 155. It also reviewed the victim impact statements submitted for the resentencing hearing. *See id.* at 156. The trial court read the transcript from the hearing on Appellant's petition to transfer the case to the Juvenile Division. *See id.* at 155. This led the trial court to review Appellant's juvenile record, which included files from the juvenile probation

office, Children and Youth Services, and two hospitalizations. *See id.* In addition, the trial court reviewed nine of its Rule 1925(a) opinions relating to Appellant's direct appeal and various PCRA petitions. *See id.* at 155-156.

The trial court also reviewed the report from the prison where Appellant was incarcerated. *Id.* at 156. This included various certifications that Appellant received while imprisoned. *See id.* at 156-157. The trial court reviewed some of the evidence presented at Appellant's trial. *See id.* at 156. It then considered the guidelines were Appellant to have been convicted after June 24, 2012, along with the guidelines mandated by *Batts II*. *See id.* at 157-158.

Next, the trial court considered the factors outlined in *Batts II* and section 1102.1. It noted that Appellant was 17 years old at the time of the murders. *Id.* at 159. It found that, at the time of the murders, Appellant was reasonably mature and did not have a diminished capacity. *Id.* The trial court found the circumstances of the crime "horrendous." *Id.* It found Appellant entirely responsible for the crime notwithstanding the fact that Zenker shot at the dog. *Id.* at 159-160.

The trial court found that Appellant had a difficult upbringing as he was declared dependent as a youth. *Id.* at 160. It found that his neighborhood environment was immaterial. *Id.* The trial court noted the emotional and developmental problems Appellant faced when he was originally sentenced

and the changes that had occurred over the intervening two decades. *See id.* at 160-161.

The trial court recognized that Appellant may have been using marijuana at the time of the murders and that he did not have past exposure to violence. *Id.* at 161-162. The trial court found that Appellant was able to assist his counsel at the time of trial and that the two had a good relationship. *Id.* at 162.

The trial court found that the murders had a minimal impact on the community. *Id.* at 165. The trial court noted its finding that Appellant was a threat to public safety in 1994; however, it found that threat diminished over two decades later. *Id.* at 165-166. The trial court found that there was some sophistication involved in the murders. *Id.* at 167.

In short, the trial court considered all relevant documents, court filings, reports, and testimony when sentencing Appellant. It carefully weighed all of these factors and determined that sentences below the applicable guidelines ranges, *i.e.*, 30 years instead of 35 years, were appropriate in this case. Then, the trial court reached the crux of Appellant's discretionary aspects challenge and explained why it chose to run Appellant's sentences consecutively instead of concurrently. It stated that:

> I cannot in any way rationalize a sentence that is not consecutive. . . . [T]here are two distinct victims. Each victim's possible life and loss of life has to be recognized and has to be, in my view, acknowledged in the sentence. And the effect of that is that I have to, in my mind, run these sentences consecutively.

N.T., 7/5/16, at 169.[20]

We ascertain no abuse of discretion in this decision. The trial court determined that separate punishments were necessitated by the nature of the offenses and the lives taken, notwithstanding the rehabilitation Appellant demonstrated while imprisoned for the past two decades. Although this Court has previously invalidated lengthy term-of-years sentences that trial courts have run consecutively, most involved property crimes. **See Dodge**, 957 A.2d at 1202. Very few have involved violent offenses. **See Commonwealth v. Coulverson**, 34 A.3d 135, 138–139 (Pa. Super. 2011). This Court has never held that running sentences for first-degree murder consecutively was an abuse of discretion.

Appellant will be eligible for parole when he is in his seventies. Although he may not live this long, he has a chance of being released into society. It was within the trial court's discretion to conclude that an individual who viciously took the lives of two innocent people is not entitled to be released into society at an earlier age, even with the reduced culpability recognized in **Roper**, **Graham**, and **Miller**. Accordingly, we conclude that the trial court did not abuse its discretion in sentencing Appellant to consecutive terms of 30

---

[20] The trial court's extensive, well-reasoned, and on-the-record explanation of its sentence in this case should serve as a model for all trial courts sentencing juveniles convicted of homicide.

years to life imprisonment and he is not entitled to relief on his discretionary aspects challenge.[21]

## III. Conclusion

In sum, we hold that a fixed term-of-years sentence can constitute a *de facto* LWOP sentence and, therefore, violates **Miller** in certain circumstances. We also hold that, in determining whether a fixed term-of-years sentence is a *de facto* LWOP sentence, we must consider the sentence for each individual crime separately and not the aggregate sentence imposed by the trial court. Moreover, a sentence of 30 years to life imprisonment is not a *de facto* LWOP sentence for a juvenile offender. Finally, we conclude that the trial court did not abuse its discretion in sentencing Appellant to two consecutive terms of 30 years to life imprisonment. Accordingly, we affirm the judgment of sentence.

---

[21] Under the specific facts of this case, and in light of the trial court's detailed factual findings at the sentencing hearing, Appellant is not entitled to relief on his discretionary aspects claim in this case. Nonetheless, we caution trial courts that they cannot circumvent the prohibition against sentencing juvenile homicide offenders capable of rehabilitation or juvenile nonhomicide offenders to LWOP by imposing consecutive, lengthy term-of-years sentences. Although such sentences may be constitutional, they are still subject to discretionary aspects review by this Court, which will not hesitate to vacate a sentence that attempts such circumvention. *Cf.* Steven L. Chanenson, *The Next Era of Sentencing Reform*, 54 Emory L.J. 377, 428 (2005) (noting that prosecutors sometimes attempt to circumvent sentencing rules by charging defendants with multiple offenses and then seek consecutive sentences). Trial courts must seriously contemplate the decision to impose lengthy term-of-years sentences and to run those sentences consecutively, instead of concurrently. If a trial court determines that the facts in a particular case warrant consecutive sentences, it should detail, on the record, why consecutive sentences are appropriate.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/21/2018