**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| STEPHEN WILLIAM THEILACKER | |
| Appellant | No. 1700 MDA 2019 |

Appeal from the Judgment of Sentence September 12, 2019
In the Court of Common Pleas of Berks County
Criminal Division at No: CP-06-CR-0004834-2018

BEFORE:  PANELLA, P.J., STABILE, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.:                      **FILED JULY 29, 2020**

Appellant, Stephen William Theilacker, appeals from his judgment of sentence of 19—50 years' imprisonment for rape, involuntary deviate sexual intercourse ("IDSI"), and aggravated indecent assault,[1] and for lifetime sex offender registration.  Appellant argues that the verdict is against the weight of the evidence, his sentence is excessive, and his lifetime registration requirement is unconstitutional.  We affirm.

The trial court accurately summarized the evidence as follows:

> In May of 2016, Coleen Hutchinson ("the Victim") was walking with crutches along Penn Avenue in Reading, Pennsylvania when Appellant . . . approached the Victim and began to make small talk, asking if she wanted a cigarette and whether she wanted to go to the movies sometime.  This initial encounter turned into a friendship, though the Victim stated that the relationship never progressed to anything more.

---

[1] 18 Pa.C.S.A. §§ 3121, 3123 and 3125.

In September of 2016, the Victim found herself homeless in the rain, when she text[ed] Appellant, who responded that he had somewhere that the Victim could stay. Earlier in the day, the Victim had consumed alcohol and was under the influence of heroin and cocaine. The Victim stated that she was, at the time, sobering up from the effects of the alcohol and drugs, but admitted that she hadn't eaten for several days and was affected by both the drug use and hunger as to her physical condition. Appellant offered to take the Victim to an abandoned building where she could stay. The Victim agreed and the two traveled to an abandoned building at 614 Spruce Street in the area of Sixth Street.

Once at the building, Appellant took the victim through a back door and up at least two flights of stairs into a room that was bare except for a mattress. Upon entering the room, the Victim made it clear that she was there to sleep since it had been days since she slept. Appellant and the Victim talked for a bit before the Victim proceeded to lie down and go to sleep, while Appellant sat on the mattress.

The Victim was awoken several times throughout the night. The first time the Victim woke up, she observed Appellant sitting on the bed. However, the second time the Victim woke up to find Appellant's hand over her mouth and nose and his knee between her shoulder blades. Appellant held a knife to the Victim's throat, pulled her head back and told her not to make a noise. The two struggled for approximately five minutes, during which Appellant continued to insist that the Victim remain quiet while the Victim, out of fear and because she could not breathe, urinated herself. Quickly realizing that there was a real possibility she would not make it out of the building alive, the Victim was able to calm herself and began to speak with Appellant. The more the Victim spoke with Appellant, the more relaxed Appellant seemed to appear and he eventually loosened the hand over the Victim's face. Appellant then pulled neckties from his bag and tied the Victim's hands behind her back, while she was still situated on her stomach on the mattress.

Appellant then flipped the Victim over on the mattress and berate[d] her [with] insults and grievance[s]. Appellant ripped the Victim's shorts and underpants off of her and proceeded to perform non-consensual oral sex on the Victim, as well as digitally

penetrating the Victim. Appellant subsequently got on top of the Victim and raped her until ejaculating.

After raping the Victim, Appellant then placed his penis inside the Victim's mouth until he ejaculated into her mouth and onto her face. Appellant continued to berate the Victim verbally throughout the assault. After a period of lying on the mattress, [Appellant] forced the Victim to get on top of him until he again ejaculates. [Appellant] untied the Victim, who then described "blacking out" at that point, but indicated that at that time, it was daylight outside.

When the Victim awoke, it was morning and Appellant told the Victim that he was going to the church in order to get food because the church was serving breakfast. Appellant also told the Victim that he was going to obtain cigarettes. As he left, Appellant took the neckties that he had earlier used to tie the Victim's hands, as well as the knife he held to her throat.

After Appellant left, the Victim located her glasses and sneakers and found an extra pair of shorts from her bag to put on. The Victim walked out of the building where she saw a woman standing at her car. The Victim asked to borrow the woman's phone and then called 9-1-1, telling the operator that she had been assaulted and needed an ambulance.

The Victim stated that she possessed a cell phone, which was the only tool she had in order to communicate with other people in her life. The Victim stated that prior to the rape, Appellant took the Victim's phone.

Once an officer showed up, the Victim took the officer to the abandoned house where the assault occurred. The Victim was then transported by ambulance to the hospital where a sexual assault examination was performed.

Officer Lance Lonsinger of the Reading City Police Department was called to the scene upon the Victim's 9-1-1 call. Upon arrival, Officer Lonsinger met with the Victim, who was upset and distraught. The Victim described being tied up and the subsequent rape and assault to Officer Lonsinger. The Victim took the officer to the abandoned building where the rape and assault occurred, but did not go inside.

After the Victim left in the ambulance, Officer Lonsinger waited for additional officers and then proceeded to perform a security sweep of the building for safety. Finding no one in the building, Officer Lonsinger found the southeast bedroom on the third floor of 614 Spruce Street where the Victim described the rape and assault as having occurred. Officer Lonsinger found a mattress in the bedroom with a disheveled comforter on the bed, along with a white towel on the bed and a pair of black shorts with pink underwear laying on the floor.

Officer Lonsinger also described finding a small piece of rope in the bedroom. Officer Lonsinger did not observe any neckties or find a knife in the bedroom. Officer Lonsinger proceeded to process the scene, which included collecting evidence and taking photographs. Upon moving the comforter, Officer Lonsinger found two more white towels. Officer Lonsinger collected the comforter, the clothing, the towels and the small piece of rope from the bedroom. The various items were transported to city hall and entered into evidence.

Within a few hours, Officer Lonsinger interviewed the Victim at Reading Hospital. During his interview with the Victim, Officer Lonsinger learned that the rope found in the bedroom was not used during the rape and assault. The rope was then removed from evidence and subsequently discarded. In the course of speaking with the Victim, Officer Lonsinger did not observe any striking bruises or ligature marks on her wrists.

Jeri Shipps, a registered nurse at Reading Hospital who specializes in sexual assault examinations, performed a sexual assault examination of the Victim on September 13, 2016. After discussing the information with the Victim, Nurse Shipps collected physical evidence from the Victim, including swabs from the Victim's mouth, vagina, rectum and a buccal swab. Nurse Shipps noted that the Victim, though distraught, was cooperative in the examination. After having collected the various samples, Nurse Shipps packaged the evidence, preserving for remand of the evidence into police custody. Nurse Shipps indicated that the Victim did not display any bruises or ligatures during the examination.

Criminal Investigator David Lehman ("C.I. Lehman") from the Reading City Police Department [investigated] the charges. In January of 2017, C.I. Lehman interviewed the Victim and, as a

result, prepared a search warrant for [Appellant]'s DNA, which was thereafter granted. After serving the search warrant on [Appellant], C.I. Lehman took a buccal sample from [Appellant], which was then secured for further testing.

When C.I. Lehman first recited the probable cause statement from the search warrant, [Appellant] denied any knowledge of the incident. On February 2, 2017, [Appellant] agreed to an interview with C.I. Lehman at the Reading Police Department criminal investigations office, which was recorded and portions of which were shown at the trial in this matter. Appellant was cooperative with the investigation.

At trial, the parties stipulated to the chain of custody of the evidence collected, including items from the scene and the samples provided by the Victim and Appellant. The parties further stipulated that a forensic examination and DNA analysis was completed on the evidence submitted. The results of the examination and analysis included that the vaginal and rectal swabs collected from the Victim were consistent with DNA samples collected from Appellant and that samples collected from the white towels found at the scene were consistent with DNA collected from Appellant.

Appellant likewise testified at trial that he and the Victim first met on Penn Avenue in the city of Reading in the summer of 2016. Appellant stated that at the time he met the Victim, he was in a program for those transitioning from prison into the general public. Appellant claimed that he understood the relationship between himself and the Victim to be one in the nature of a sexual relationship between two consenting adults. Furthermore, Appellant, in his interview with C.I. Lehman, explained that he and the Victim had engaged in various consensual sexual encounters at different locations. Appellant also claimed that subsequent to the rape and assault, the Victim contacted him on several occasions in an attempt to blackmail him for money that the Victim allegedly owed a drug dealer.

Appellant testified that on September 12, 2016, the Victim contacted him by phone that "she wanted to party and to have sex in the abandoned house," but that he refused because he wanted to spend time with his son. On September 13, 2016, Appellant claimed that after receiving a text from the Victim early in the morning, he met with the Victim on Cherry Street in Reading

and the two began to walk together, arriving at 614 Spruce Street where Appellant and the Victim had consensual sex, ate food and smoked crack cocaine.

Appellant claimed that after having sex, he cleaned himself and the Victim up with towels that he brought. Appellant claimed that he lied to C.I. Lehman regarding the last time he had sex with the Victim because he had been threatened by the Victim and others on her behalf. On cross-examination, Appellant denied ever having bound the Victim's hands with a necktie and repeated his claims that the Victim and others had threatened him with violence or reporting to the police unless he gave the Victim money.

Trial Court Opinion, 12/12/19, at 1-5 (citations omitted).

The jury found Appellant guilty of rape, IDSI and aggravated indecent assault as well as other offenses that merged for purposes of sentencing. The court ordered an investigation by the Sexual Offenders Assessment Board. At sentencing, the court found that Appellant was not a sexually violent predator, but it imposed consecutive sentences for rape, IDSI and aggravated indecent assault[2] and ordered Appellant to register for life as a sex offender. Appellant filed timely post-sentence motions challenging the weight of the evidence and seeking modification of sentence. The court denied Appellant's post-sentence motions, and this timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises three issues on appeal:

_____

[2] The court sentenced Appellant to 7½—20 years' imprisonment for rape, 7½—20 years' imprisonment for IDSI and 4—10 years' imprisonment for aggravated indecent assault.

> 1. Whether the trial court abused its discretion in accepting the Jury's verdict, where the verdict was against the weight of the evidence.
>
> 2. Whether the sentencing court abused its discretion when sentencing Appellant by running the sentence on each count consecutively, rather than concurrently.
>
> 3. Whether the lifetime sex offender registration is unconstitutional and/or illegal.

Appellant's Brief at 14.

Appellant first argues that the trial court should have "denied the verdict" and granted a new trial because the verdict was against the weight of the evidence. *Id.* at 29. We disagree.

The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015). A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. *Id.* Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Id.* On appeal, "our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience." *Id.* Thus, "appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the

weight of the evidence." ***Id.*** An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. ***Id.***

According to Appellant, the victim texted him on the day of the incident to find a place to stay for the night. He had a prior consensual sexual relationship with the victim, and they engaged in consensual sex that night. Her account of the events was doubtful because she was sleep-deprived and under the influence of drugs and alcohol. Her testimony that she urinated during Appellant's assault was not credible, because the mattress she was lying on was dry, and it would have been wet had she actually urinated. Finally, she had no bruises, cuts, or marks that would indicate that she was tied up, forcibly raped, or assaulted.

Appellant overlooks substantial evidence of guilt that the Commonwealth presented during trial. The victim described the events culminating in the rape and assault, including her platonic, non-sexual relationship with Appellant and her own criminal background and drug and alcohol abuse. She candidly admitted suffering the effects of drug use during the rape and assault. Although unable to provide specific times, she provided the date of the events and was able to identify whether they occurred while it was dark or light outside. She promptly reported the crime and was cooperative throughout the investigation and intrusive rape kit examination. The police investigator discovered the towels, underwear and shorts that she described. Forensic testing confirmed the presence of Appellant's DNA on

towels in the room and in samples from the victim's body. Furthermore, Appellant's account of the events lacked credibility because it changed over time. During pretrial interviews with C.I. Lehman, he denied having any sex with the victim, consensual or otherwise, but during trial, after the Commonwealth introduced evidence of DNA in samples from the victim's body, Appellant testified that he had consensual sex with the victim.

In short, ample evidence supports the verdict, and the jury was free to believe the victim's, and the Commonwealth's, version of events instead of Appellant's. It was within the trial court's discretion to determine that the verdict did not shock its conscience.

In his second argument, Appellant contends that the trial court abused its discretion by imposing consecutive sentences for what amounted to "one interaction" with the victim. Appellant's Brief at 36. We disagree.

Appellant must satisfy four factors in order for this Court to consider his challenge to the discretionary aspects of his sentence. We must consider: (1) whether he has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether he properly preserved the issue at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether Appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether he presents a substantial question that his sentence is not appropriate under the Sentencing Code, **see** 42 Pa.C.S.A. § 9781(b). **Commonwealth v. Samuel**, 102 A.3d 1001, 1006-07 (Pa. Super. 2014). Appellant satisfied the first three

factors by filing a timely notice of appeal, challenging the length of his sentence in post-sentence motions and including a Pa.R.A.P. 2119(f) statement in his brief explaining why this Court should address his sentencing argument. With regard to the fourth factor, whether Appellant has raised a substantial question, although bald claims of an excessive sentence do not raise a substantial question, *Commonwealth v. Swope*, 123 A.3d 333, 339 (Pa. Super. 2015), "an excessiveness claim in conjunction with an assertion that the court did not adequately consider a mitigating factor may present a substantial question." *Commonwealth v. Zeigler*, 112 A.3d 656, 662 (Pa. Super. 2015). Appellant asserts an excessive sentence and the court's failure to consider mitigating factors. We therefore, will consider the merits of his claim.

The trial court rejected Appellant's "one interaction" argument, reasoning:

> The Victim testified that Appellant first performed oral sex on her and digitally penetrated the Victim. Appellant then got on top of the Victim and proceeded to raped her. Almost immediately thereafter, Appellant forced the Victim to perform oral sex on him. After a period of rest, Appellant then forced the Victim to get on top of him again. The acts from which the separate charges flow are distinct offenses that, although perpetrated in sequential and rapid succession, are discrete crimes under the law. The mere fact that Appellant committed the crimes within brief period is not convincing as to be considered a single criminal act. As such, we find that the alleged error is without merit.

Trial Ct. Op. at 10.

> Appellant also challenges the court's sentence on the basis that the consecutive nature of the sentences was excessive in light of

the factors set forth in 42 Pa.C.S.A. § 9721(b). Appellant does not contend that the sentence exceeds statutory limits, but instead, that it fails to comport with a consideration of Appellant's rehabilitative needs.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Raven***, 97 A.3d 1244, 1253 (Pa. Super. 2014). Additionally, "[i]t is well settled that imposition of consecutive rather than concurrent sentences rests within the trial court's discretion," and that a defendant convicted of multiple offenses is not entitled to a "volume discount" on the aggregate sentence. ***Commonwealth v. Foust***, 180 A.3d 416, 434 (Pa. Super. 2018). "[T]o constitute an abuse of discretion, a sentence must either exceed the statutory limits or be manifestly excessive." ***Commonwealth v. Rooney***, 442 A.2d 773, 774-75 (Pa. Super. 1982).

At the sentencing hearing of Appellant, this court set forth extensively the reasons and considerations taken into account in imposing sentence upon Appellant. We likewise placed those reasons on the record, which included our review of the testimony presented at trial, the pre-sentence investigation report, the severity of the crimes, the effects of the crime upon the Victim and Appellant's history. We also considered that Appellant was not found to be a sexually violent predator, but we considered that fact that the conduct was of such a nature that is seriously condemned in society. The Superior Court has held that "where the sentencing court imposed a standard-range sentence with the benefit of a pre-sentence report, we will not consider the sentence excessive." ***Commonwealth v. Corley***, 31 A.3d 293, 298 (Pa. Super. 2011). Moreover, where the court has the benefit of a pre-sentence investigation report, there is a presumption "that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along

- 11 -

> with mitigating statutory factors." ***Commonwealth v. Luketic***, 162 A.3d 1149, 1165 (Pa. Super. 2017).
>
> This court extensively expressed our reasons for sentencing and the factors considered on the record. We also had the benefit of the pre-sentence investigation report. We find Appellant's argument that the sentence failed to consider his rehabilitative needs to be unavailing.

***Id.*** at 9-11. We agree with the trial court's reasoning and conclude that it acted within its discretion by imposing consecutive sentences for rape, IDSI and aggravated indecent assault.

In his final argument, Appellant contends that his lifetime sex offender registration requirement prescribed under SORNA[3] is unconstitutional because it exceeds the statutory sentencing maximum for the offenses that Appellant was convicted of committing. We recently rejected the same argument in ***Commonwealth v. Prieto***, 206 A.3d 529 (Pa. Super. 2019). There, the defendant argued that his requirement to register for fifteen years as a Tier I offender under SORNA was both an illegal sentence and "cruel and unusual" punishment, because the statutory maximum penalty for the crime to which he pled *nolo contendere* was only seven years. We held:

> In ***Commonwealth v. Strafford***, 194 A.3d 168 (Pa. Super. 2018), a panel of this Court held that our legislature could—and did—create multiple types of punishment for a given crime. Thus, we held the legislature may punish sex-offenders by both a statutory-maximum incarceration period and a limitless SORNA-registration period thereafter. ***See id.*** We held those two punishments are separate and distinct. ***See id.*** Accordingly, sex-

---

[3] The Sex Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S.A. §§ 9799.10—9799.41.

offenders' SORNA registration periods are unrelated to whatever maximum-incarceration period Chapter 11 of the Crimes Code establishes for their crimes. Specifically, we recognized the following:

> In SORNA, the legislature authorized courts to include periods of registration as part of a sentence. Similar to the treatment of the payment of fines or restitution, the legislature did not tie the period of registration to the length of incarceration. *See* 42 Pa.C.S.[A.] § 9799.14 ("Sexual offenses and tier system"); 42 Pa.C.S.[A.] § 9799.15 ("Period of registration"). SORNA's registration provisions are not constrained by [18 Pa.C.S.A. §] 1103. Rather, SORNA's registration requirements are an authorized, punitive measure separate and apart from [the] [a]ppellant's term of incarceration. The legislature did not limit the authority of a court to impose registration requirements only within the maximum allowable term of incarceration; in fact, the legislature mandated the opposite and required courts to impose registration requirements in excess of the maximum allowable term of incarceration.

*Strafford*, 194 A.3d at 173.

*Prieto*, 206 A.3d at 535. This reasoning is on point and defeats Appellant's argument.

For these reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/29/2020

- 13 -