J-A12019-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellee :
:
v. :
:
:
JESSICA NICOLE HOLTMEYER :
:
Appellant : No. 1370 WDA 2019

Appeal from the Judgment of Sentence Entered December 7, 2018
In the Court of Common Pleas of Clearfield County
Criminal Division at No(s): CP-17-CR-0000502-1998,
CP-17-CR-0000503-1998

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.: **FILED SEPTEMBER 14, 2020**

Appellant, Jessica Nicole Holtmeyer, appeals from the judgment of
sentence entered in the Clearfield County Court of Common Pleas, following
the grant of relief on her petition under the Post-Conviction Relief Act
("PCRA").[1] We affirm.

The relevant facts and procedural history of this case are as follows. On
May 9, 1998, Appellant and several teenagers murdered Kimberly Dotts.
Appellant was 16 years old at the time. The Commonwealth charged Appellant
as an adult at two separate docket numbers with several offenses stemming

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S.A. §§ 9541-9546.

from the May 9th incident.[2]  At Docket No. 502-1998, the Commonwealth

charged Appellant with criminal homicide.  At Docket No. 503-1998, Appellant

faced charges for, *inter alia*, one count of conspiracy to commit homicide and

two counts each of aggravated assault and conspiracy to commit aggravated

assault.   The trial court consolidated the cases for trial upon the

Commonwealth's request.

A prior panel of this Court summarized the evidence presented at

Appellant's jury trial, in part, as follows.

> On May 9, 199[8], the 16-year-old [A]ppellant, with the help of her friends, cruelly and brutally murdered 15-year-old Kimberly Dotts (hereinafter "the victim").  The group of teens involved in this incident referred to themselves as "the Runaways."   The gang's title was derived from their intentions—to run away from home to Florida.  The self-titled gang included Aaron Straw (18), Dawn Lanager (15), Theresa Wolfe (14), Patrick Lucas (16), Clint Canaway (17), and the victim (15).  Appellant, however, did not have intentions on travelling to Florida.
>
> In preparation for their attempt to run away to Florida, the teens stole a car, which they later crashed.  The gang then walked to [A]ppellant's home; however, when they arrived, [A]ppellant was sleeping.  Straw testified that [A]ppellant became upset when she realized the victim was with the group, because the victim was thought to be a "snitch." Testimony was also presented that the movie "Scream" was on the television and that [A]ppellant commented it would be fun to hang someone.
>
> The teens then traveled to a hunting camp…where they planned to stay until they left for Florida that evening.  They

---

[2] The record does not indicate why the Commonwealth charged Appellant at separate docket numbers for offenses relating to the same incident and victim. Regardless, the cases proceeded virtually as one case.

vandalized the hunting cabins—flipping a camper over and stealing a dog, liquor, clothesline rope, and sparklers from various campers.

Then a bizarre "initiation" ceremony began. Straw threw [a] rope over a tree limb, and a loop was created at the other end. One by one, with the exception of [A]ppellant and Straw, the members of the Runaways each placed the noose around his or her neck. The victim was last to complete the ritual, however, she was not permitted to take her head out of the noose. Rather, Straw and [A]ppellant began to pull on the rope. The victim was pulled onto her tiptoes for approximately 20-30 seconds while crying. The victim was released when the group heard a four-wheeler approaching. Choking and crying, the victim took the noose off her neck. At this point, it appears that everyone in the group with the exception of the victim, [A]ppellant, Straw, and Wolfe left the area.

Straw then placed the rope over another tree, and he tied the other end of the rope to a rock. The victim was convinced to put her neck into the noose again. Appellant and Straw then pulled on the rope until the victim passed out. Straw testified that the victim's lips had turned blue and that she was not breathing. The victim's body was then dropped to the ground. Wolfe checked to see if the victim was alive, and Straw grabbed a log and threw it on the victim's abdomen. The victim began to breathe, "like someone [having] an asthma attack," and move her arms and legs. Straw tried to burn the rope off her neck so "it would relieve all that pressure, so we could get her up off the ground." Appellant picked up a large rock, raised it over her head, and at least twice struck the victim in the face.

Lucas testified that when he was summoned to return to the scene, he saw the victim in a pool of blood. He also noticed that [A]ppellant had rope burns on her hands. The victim's body was then covered with leaves and branches. The rope was thrown into an abandoned car. Wolfe and Lanager testified that [A]ppellant stated she wanted to "do it again." Testimony was also presented that [A]ppellant threatened to kill anyone who said anything. … The victim's body was "discovered" in the woods by Straw and a few other gang members.

… Testimony of both lay witnesses and police officers was presented, along with the testimony of…a forensic pathologist who performed the autopsy on the victim. [The pathologist] testified regarding his examination and determined the cause of death was due to the blows to the victim's head by the rock.

*Commonwealth v. Holtmeyer*, No. 1306 WDA 2000, at 1-5 (Pa.Super. filed Nov. 20, 2001) (unpublished memorandum) (internal record citations and footnote omitted). On January 28, 1999, a jury convicted Appellant of first-degree murder and related offenses. The court sentenced Appellant at both docket numbers on March 24, 1999, to an aggregate term of life without parole ("LWOP").[3]

This Court affirmed the judgment of sentence on November 20, 2001, and our Supreme Court denied allowance of appeal on June 19, 2002. On June 7, 2010, Appellant filed *pro se* her first PCRA petition. The court appointed counsel and later denied Appellant's petition on April 15, 2011.

On August 3, 2012, Appellant filed a counseled PCRA petition, her second, requesting relief under *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). Upon Appellant's request, the PCRA court stayed the petition pending the disposition of several cases before the U.S.

---

[3] The court imposed lesser terms of imprisonment for the other convictions. On April 28, 2000, the court amended the sentencing order to run some of the sentences on the less serious crimes concurrent to the LWOP sentence for first-degree murder. The March 24, 1999 judgment of sentence otherwise remained intact.

- 4 -

Supreme Court and Pennsylvania Supreme Court interpreting/applying **Miller**.

On March 16, 2016, Appellant filed an amended PCRA petition citing **Montgomery v. Louisiana**, ___ U.S. ___, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016). Appellant also requested a stay pending the Pennsylvania Supreme Court's decision in **Commonwealth v. Batts**, 640 Pa. 401, 163 A.3d 410 (2017) ("**Batts II**"), which the PCRA court granted.

On July 6, 2018, the PCRA court granted Appellant relief and ordered resentencing. On July 27, 2018, the court conducted a resentencing hearing, after which the court held its decision in abeyance. Subsequently, the Commonwealth filed a sentencing brief, opining that Appellant is not incorrigible, and recommending that the court resentence Appellant to thirty-five (35) years to life incarceration for first-degree murder.

On December 7, 2018, the court conducted another sentencing hearing and determined that the record did not show Appellant was incapable of rehabilitation. That same day, the court vacated Appellant's sentences at both docket numbers. Upon review of the whole record and with the benefit of a pre-sentence investigation ("PSI") report, the court resentenced Appellant at both docket numbers. Specifically, the court imposed a sentence of thirty-five (35) years to life imprisonment for first-degree murder.[4]

_____

[4] The court imposed lesser terms of imprisonment for the other convictions concurrent with Appellant's first-degree murder sentence.

On December 17, 2018, Appellant timely filed post-sentence motions, which the court denied on March 8, 2019. On April 3, 2019, Appellant timely filed a notice of appeal.[5] The court ordered Appellant on April 17, 2019, to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b); Appellant complied on May 1, 2019.

Appellant raises the following issues for our review:

> Whether the court erred as a matter of law when it determined that [Appellant] should be subject to a mandatory maximum of a life sentence when the imposition of such a maximum sentence was mandatory in nature, did not reflect an[] individualized assessment of [Appellant]'s culpability and ultimate sentence, and was not supported by an "on the record" discussion of the salient and applicable factors as set out in the U.S. Supreme Court holding in the case of **Miller v. Alabama** and **Commonwealth v. Batts**[?]
>
> Whether the imposition of a 35-year minimum sentence in this case amounts to error as a matter of law when the

_____

[5] On September 26, 2019, this Court issued a rule to show cause why Appellant's appeal should not be quashed where Appellant filed a single notice of appeal from more than one underlying docket number. In **Commonwealth v. Walker**, 646 Pa. 456, 185 A.3d 969 (2018), our Supreme Court held that an appellant must file separate notices of appeal from orders which resolve issues arising at separate trial court docket numbers, and an appellant's failure to do so requires the appellate court to quash the appeal. Nevertheless, this Court recently held that a breakdown in the operations of the court occurs when the trial court suggests that a single notice of appeal from an order listing multiple docket numbers is sufficient to perfect the appeal. **See Commonwealth v. Larkin**, ___ A.3d. ___, 2020 WL 3869710 (Pa.Super. filed July 9, 2020) (_en banc_). In those circumstances, the appellate court can overlook an appellant's noncompliance with **Walker** and decline to quash the appeal. **Id.** Here, when the court advised Appellant of her appellate rights following resentencing, the court suggested Appellant needed to file only a single notice of appeal. Thus, we decline to quash Appellant's appeal for any technical noncompliance with **Walker**. **See id.**

sentence was imposed pursuant to guidance gleaned from the current PA statute found at 18 Pa.C.S.A. § 1102.1, and such a sentence does not reflect an individualized sentence as mandated [by] the U.S. Supreme Court in the case of *Miller v. Alabama*[?] Such a sentence is mandatory under that statute regardless of the application of the factors set forth in the U.S. Supreme Court case of *Miller v. Alabama*.

Whether the imposition of a 35-year minimum sentence in this case amounts to error as a matter of law when the sentence was imposed absent the requisite on the record statement pertaining to the court's application of the salient and applicable factors set forth in the U.S. Supreme Court case of *Miller v. Alabama*[?]

Whether the sentencing court abused its discretion…when it discounted the weight of the evidence as applied to the relevant factors set forth in the U.S. Supreme Court's holding in the case of *Miller v. Alabama* which applied to the issues of youthful trauma and of rehabilitation, assigned greater weight to other factors such as gravity of the offense and a 20-year-old victim impact statement, and failed to set forth its reasoning in an "on the record" discussion of the application of all the factors set forth in *Miller v. Alabama*[?]

Whether the court's imposition of a 35-year minimum sentence amounts to error as a matter of law when such a sentence would amount to a "*de facto*" life sentence under the circumstances of this case, contrary to the U.S. Supreme Court's holding in the case of *Miller v. Alabama*[?]

(Appellant's Brief at 8-9) (reordered for purposes of disposition).[6]

In her second and third issues combined, Appellant argues the

resentencing court failed to consider the factors delineated in *Miller* for

_____

[6] In her brief, Appellant states that she abandons her first issue on appeal (*see* Appellant's Brief at 28), so we give it no further attention.

sentencing a juvenile convicted of first-degree murder. Appellant asserts the court also did not recite on the record its application of the **Miller** standards. Appellant concludes this Court should vacate and remand for a new resentencing hearing. We disagree.

A claim that a sentencing court failed to comply with **Miller** implicates the legality of the sentence. **Batts II, supra** at 444, 163 A.3d at 435. Therefore, our standard of review is *de novo* and our scope of review is plenary. **Id.** The sentencing court's determination of whether to impose a LWOP sentence upon a juvenile is a mixed question of law and fact. **Id.** "[W]e defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusion." **Id.** at 444, 163 A.3d at 435-36.

In 2012, the United States Supreme Court held that mandatory LWOP sentences for those under 18 years old at the time they committed homicide constitute cruel and unusual punishments in violation of the Eighth Amendment to the United States Constitution. **Miller, supra** at 489, 132 S.Ct. at 2475, 183 L.Ed.2d at ____.[7] "A juvenile homicide defendant can only be sentenced to LWOP if…she is permanently incorrigible, irreparably corrupt, or irretrievably depraved." **Commonwealth v. Foust**, 180 A.3d 416, 427

---

[7] Subsequently, the United States Supreme Court held that **Miller** established a new substantive constitutional right that applies retroactively to cases on state collateral review. **See Montgomery, supra**.

- 8 -

(Pa.Super. 2018) (citing **Miller, supra** at 471, 473, 479–480, 132 S.Ct. at 2464-66, 2469). Thus, there is a presumption against sentencing a juvenile convicted of murder to LWOP, which the Commonwealth can rebut if it proves beyond reasonable doubt that the juvenile is incapable of rehabilitation. **Batts II, supra** at 411, 163 A.3d at 416.

In the wake of **Miller**, the Pennsylvania General Assembly enacted 18 Pa.C.S.A. § 1102.1, which provides in relevant part as follows:

> **§ 1102.1. Sentence of persons under the age of 18 for murder, murder of an unborn child and murder of a law enforcement officer**
>
> **(a) First degree murder.**—A person who has been convicted after June 24, 2012, of a murder of the first degree…and who was under the age of 18 at the time of the commission of the offense shall be sentenced as follows:
>
> > (1) A person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life.
>
> \* \* \*
>
> **(e) Minimum sentence.**—Nothing under this section shall prevent the sentencing court from imposing a minimum sentence greater than that provided in this section. Sentencing guidelines promulgated by the Pennsylvania Commission on Sentencing may not supersede the mandatory minimum sentences provided under this section.
>
> \* \* \*

18 Pa.C.S.A. § 1102.1(a)(1), (e).

"Section 1102.1 does not prescribe minimum sentences for juvenile

homicide defendants who…were convicted of first-[degree] or second-degree murder [**on or**] **before** June 24, 2012." ***Foust, supra*** at 428 (emphasis added). Nevertheless, our Supreme Court has held that Section 1102.1 also applies to juveniles convicted of first-degree or second-degree murder prior to June 25, 2012. ***Batts II, supra*** at 401, 459–60, 163 A.3d at 444–45. So, a juvenile who committed murder between the ages of 15 and 18, and was convicted of first-degree murder before June 25, 2012, is subject either to LWOP, or a mandatory maximum life imprisonment term and a minimum term-of-years sentence. ***Id.***; 18 Pa.C.S.A. § 1102.1(a)(1), (e).

The ***Miller*** Court established that a juvenile offender's sentence for murder must be individualized, and listed several factors for sentencing courts to consider when imposing a sentence unique to the juvenile. ***Miller, supra*** at 477-78, 132 S.Ct. at 2468, 183 L.Ed.2d at ___. Section 1102.1(d) also enumerates factors to guide sentencing courts in determining whether to impose a sentence of LWOP upon a juvenile convicted of first-degree or second-degree murder. 18 Pa.C.S.A. § 1102.1(d).

> [F]or purposes of uniformity in sentencing juveniles facing [LWOP], courts should examine both the ***Miller*** factors and the section 1102.1(d) factors prior to [sentencing a juvenile to LWOP], regardless of whether the juvenile was convicted pre- or post–***Miller***. We observe that some of the ***Miller*** factors are noticeably absent from section 1102.1(d). All of the ***Miller*** factors, however, must be considered by a court prior to sentencing a juvenile to [LWOP].

***Batts II, supra*** at 476 n.23, 163 A.3d at 455 n.23. "When a juvenile is exposed to a potential sentence of [LWOP] the trial court must consider the

*Miller* factors, on the record, prior to imposing a sentence" even where the juvenile ultimately does not receive a LWOP sentence. *Commonwealth v. Machicote*, ___ Pa. ___, ___, 206 A.3d 1110, 1120 (2019). On the other hand, where the Commonwealth does not seek and the sentencing court does not impose a sentence of LWOP, the court need not consider the *Miller* factors. *Commonwealth v. Lekka*, 210 A.3d 343, 357 (Pa.Super. 2019).

Instantly, Appellant was 16 years old when she committed her offenses, and the jury convicted her of first-degree murder before June 25, 2012. Prior to resentencing, the Commonwealth conceded that the record did not show Appellant was permanently incorrigible, and did not recommend a LWOP sentence. At the December 7, 2018 resentencing hearing, the court agreed that Appellant was not incapable of rehabilitation. The court resentenced Appellant for first-degree murder to 35 years to life imprisonment, in compliance with *Miller*. *See Batts II, supra*; 18 Pa.C.S.A. § 1102.1(a), (e). The resentencing court was not obligated to discuss the *Miller* sentencing factors upon resentencing, because the Commonwealth did not seek, and the court did not impose, a LWOP sentence. *See Lekka, supra*. Therefore, Appellant's second and third issues merit no relief. *See Batts II, supra*.

In her fourth issue, Appellant argues the resentencing court gave too much weight to the Section 1102.1(d) factors and the gravity of the offense when it fashioned her minimum sentence for first-degree murder. Appellant submits the court should not have applied the sentencing guidelines in 18

Pa.C.S.A. § 9721(b). Appellant complains that even when the court relied upon the Section 9721(b) factors, it gave no weight to the protection of the public. Appellant posits the court also erroneously considered and granted inordinate weight to a 20-year-old impact statement of the victim's family. Appellant concludes this Court should vacate and remand for resentencing. We disagree.

As presented, this issue implicates the discretionary aspects of Appellant's sentence. *See, e.g., Batts II, supra* (providing that where Commonwealth does not seek LWOP sentence, sentencing court should apply traditional considerations of Section 9721(b) when imposing sentence); *Commonwealth v. Cartrette*, 83 A.3d 1031 (Pa.Super. 2013) (*en banc*) (explaining claim that sentencing court failed to consider Section 9721(b) factors pertains to discretionary sentencing matters); *Lekka, supra* (examining juvenile murder offender's challenge to sentencing court's application of sentencing factors in Section 1102.1(d) and Section 9721(b) as discretionary aspects of sentence claim).

A challenge to the discretionary aspects of sentencing is not automatically reviewable as a matter of right. *Commonwealth v. Hunter*, 768 A.2d 1136 (Pa.Super. 2001), *appeal denied*, 568 Pa. 695, 796 A.2d 979 (2001). Prior to reaching the merits of a discretionary sentencing issue:

> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify

sentence, *see* [Pa.R.Crim.P. 720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa.Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted).

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Anderson*, 830 A.2d 1013, 1018 (Pa.Super. 2003). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Sierra*, 752 A.2d 910, 913 (Pa.Super. 2000) (quoting *Commonwealth v. Brown*, 741 A.2d 726, 735 (Pa.Super. 1999) (*en banc*), *appeal denied*, 567 Pa. 755, 790 A.2d 1013 (2001)).

This Court does not accept bald assertions of sentencing errors as substantial questions. *Commonwealth v. Malovich*, 903 A.2d 1247 (Pa.Super. 2006). Rather, an appellant must articulate the bases for her allegations that the sentencing court's actions violated the sentencing code. *Id.* Ordinarily, "a claim that the sentencing court failed to consider or accord proper weight to a specific sentencing factor does not raise a substantial question." *Commonwealth v. Swope*, 123 A.3d 333, 339 (Pa.Super. 2015). *But see Lekka, supra* at 351-52 (determining that claim sentence was

- 13 -

unduly harsh and sentencing court granted disproportionate weight to certain *Miller* and Section 1102.1(d) factors posed substantial question) (citing *Commonwealth v. Caldwell*, 117 A.3d 763, 769-70 (*en banc*) (Pa.Super. 2015), *appeal denied*, 633 Pa. 774, 126 A.3d 1282 (2015) (providing argument that court did not consider mitigating factors, coupled with excessive sentence claim, raised substantial question)).

Instantly, Appellant raised her discretionary sentencing claim in a timely post-sentence motion and filed a timely notice of appeal. Appellant did not include a Rule 2119(f) statement in her brief on appeal. *See Evans, supra*. The Commonwealth, however, did not object, so we will not dismiss Appellant's discretionary aspects of sentencing claim on this basis. *See Commonwealth v. Brougher*, 978 A.2d 373, 375 (Pa.Super. 2004) (determining Commonwealth's failure to object to absence of appellant's Rule 2119(f) statement does not require waiver of appellant's discretionary aspects of sentencing claim).

Although Appellant complains the resentencing court: (i) wrongly based Appellant's minimum sentence for first-degree murder upon the factors in Section 1102.1(d) and Section 9721(b); and (ii) incorrectly balanced the sentencing guidelines of those statutes, Appellant does not allege the court's sentence was excessive or unduly harsh. Thus, Appellant does not appear to raise a substantial question. *Compare Lekka, supra*.

Moreover, even if Appellant's argument presented a substantial

question, it would not merit relief. This Court will not disturb the judgment of the sentencing court absent an abuse of discretion. ***Commonwealth v. Fullin***, 892 A.2d 843 (Pa.Super. 2006).

> [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. In more expansive terms, …: An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.
>
> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

***Commonwealth v. Walls***, 592 Pa. 557, 564-65, 926 A.2d 957, 961-62 (2007) (internal quotation marks, footnotes, and citations omitted).

Pursuant to Section 9721(b), "the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the

impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). ***See also Commonwealth v. Fowler***, 893 A.2d 758 (Pa.Super. 2006) (stating where court had benefit of PSI report, we can presume it was aware of relevant information regarding defendant's character and weighed those considerations along with mitigating statutory factors).

Here, at the December 7, 2018 resentencing hearing, the court explained its consideration of the Section 1102.1 and Section 9721(b) factors as applied to its imposition of Appellant's minimum sentence for first-degree murder, as follows:

> …I conclude what the Commonwealth concedes, that proof beyond a reasonable doubt [that Appellant] is not able to be rehabilitated has not been presented by the Commonwealth.
>
> \* \* \*
>
> Quite frankly, given the circumstances of this killing…if [Appellant] appeared today resisting rehabilitation, as she did in the early days of her confinement, I believe one could conclude that this is the rare case envisioned by the U.S. Supreme Court.
>
> However, the evidence in this case is otherwise. Given the Commonwealth's position, I will not go into depth in an analysis of the ***Miller*** criteria and the factors set forth in Section 1102.1.
>
> I would indicate that I have reviewed those factors in relation to the evidence presented and conclude that the imposition of [a] sentence of [LWOP] in this case would not pass constitutional muster. I will then go to determine what the appropriate sentence would be.

- 16 -

\*   \*   \*

In ***Batts***[ ***II***], the [Pennsylvania Supreme C]ourt provides guidance when imposing a sentence of life with the possibility of parole in determining the minimum term of imprisonment.   The [C]ourt in that case…provided as follows:  In sentencing a juvenile offender to life imprisonment with the possibility of parole, traditional sentencing considerations apply, and it cites Section 9721(b) of the judicial code.

The sentencing court should fashion the minimum term of incarceration using it [as] guidance, Section 1102.1([e]) of the crimes code; and that's the section which sets the minimum sentence for this age range at 35 years.

\*   \*   \*

So, in imposing the minimum sentence in this case of the first-degree murder charge, we must use as guidance Section 1102.1(a), even though it directly applies only to cases where the homicide occurs after June 24th, 2012.

The Pennsylvania [Supreme Court] stated in ***Batts***[ ***II***], we believe that Section 1102.1 will help frame the exercise of judgment by the court in imposing a sentence and may provide an essential starting point that must be respected and considered when determining an appropriate minimum sentence for a juvenile convicted of first-degree murder prior to the ***Miller*** decision.

…I'll refer to the Section 9721 factors.

The first factor that I will consider is the gravity of the offenses as it relates to the impact on the life of the victim and the community.  In this case, [Appellant] took Kimberly [D]otts' life in a manner so gruesome that the [Superior Court], in its [memorandum decision], stated the facts of this case are shocking.  One could only try to imagine the horror this 1[5]-year-old girl experienced before she died.  Her body was covered with branches and abandoned only to be found at a later time.

The effect on the victim's family is evidenced in the original

victim [family] impact statements and in the words of Kimberly's mother at this proceeding. In our opinion, this factor goes in favor of a significant minimum sentence, perhaps in excess of the Section 1102.1 minimum.

The next factor provides a mitigating influence, and that is the rehabilitative needs of [Appellant]. [Appellant] clearly had significant rehabilitative needs upon her initial incarceration.

The testimony of the July 27, 2018 hearing details [Appellant]'s troubled upbringing prior to the commission of this offense. It also goes into great depth with regard to her rehabilitative efforts and the extent of her rehabilitation.

Troy Edwards, who is a reentry service—or at least at the time of the hearing was a reentry service coordinator at [SCI] Muncy, has known [Appellant] at the institution for 14 years. He testified to [Appellant]'s work as a certified peer support specialist, her educational achievement, her prison employment activities and her House of Hope involvement.

He gave his opinion that as a reentry service specialist, he believes, and these are his words from the transcript, [Appellant]'s as, if not better, prepared for reentry as anyone who would walk through these doors.

Devant…Cole, a social worker at Muncy, testified to [Appellant]'s role as her detail or assistant. Ms. Cole testified that she believes [Appellant] is as prepared to enter society as inmates she has prepared for reentry.

[Appellant] also presented Deborah A. Mucha, an expert in the field of psychology and trauma therapy. She testified concerning her knowledge of this case and her contact with [Appellant].

She detailed her knowledge of [Appellant]'s early life prior to the murder and of [Appellant]'s programs at Muncy since her incarceration. She attributed [Appellant]'s participation in this incident to be the result of automatic obedience, which is a phenomenon where one will do whatever is requested of them because of extreme traumatization.

She pointed to Aaron Straw, a codefendant in this case, and [Appellant]'s boyfriend at the time, as the source of the trauma. Ms. Mucha testified at length regarding [Appellant]'s rehabilitation while at Muncy, including her participation in the program House of Hope.

She gave her opinion that…[Appellant] has been rehabilitated.

Finally she gave her opinion as to risk assessment of reoffending, which she gave, and these are her words, very little probability.

[Appellant] spoke at the hearing and expressed her position in the letter which I received since the hearing, which has been provided to counsel. She expressed remorse and referred to her rehabilitation and changed life.

The last matter to be considered under Section 9721 is a protection of the public. This factor had to be one of great concern at the initial sentencing hearing. If one accepts the testimony of [Appellant]'s rehabilitation, it would be logical to conclude that this factor is not as significant today. Although, in our opinion, we must keep in mind we're dealing with an individual who was capable of such acts at a point in her life.

(N.T. Resentencing, 12/7/18, at 11-16).

At the outset, the record belies Appellant's claim that the resentencing court considered and granted inordinate weight to the Section 1102.1(d) factors when it fashioned the minimum term for Appellant's first-degree murder sentence. Instead, the resentencing court explained it **did not** apply the Section 1102.1(d) sentencing factors. The court added it looked to the minimum sentence prescribed in Section 1102.1 as a guide in determining the minimum sentence term for first-degree murder. ***See Batts II, supra*** (explaining that if juvenile convicted of murder does not receive LWOP

sentence, sentencing court may determine minimum sentence term; although sentencing court has discretion in setting minimum term, minimum sentences in Section 1102.1(a) should guide court). Furthermore, the resentencing court did not abuse its discretion when it applied the Section 9721(b) sentencing guidelines to fashion Appellant's minimum sentence for first-degree murder, because the Commonwealth did not seek and the resentencing court did not impose a LWOP sentence. ***See id.***

The record indicates the resentencing court considered each of the Section 9721(b) sentencing factors. Appellant mischaracterizes the weight the court ascribed to the gravity of the offense and the need to protect the public. The resentencing court merely recounted the facts of the offense, commented on the nature of the offense, and reiterated this Court's view of the facts on direct appeal. Nothing in the record indicates the resentencing court placed undue weight on the gravity of the offense. Additionally, the court opined that the protection of the public did not garner as much weight at resentencing as it did in the original sentence, due to the court's finding that Appellant is not incorrigible and has already made progress toward rehabilitating. (N.T. Resentencing, 12/7/18, at 16). Also, contrary to Appellant's argument, the court specifically noted that it considered the impact statement of victim's family from the original sentencing **and** the impact statement the victim's mother made at resentencing. (***Id.*** at 14). Furthermore, the court had the benefit of a PSI report at resentencing. ***See***

***Brougher, supra***.   Thus, we see no abuse of the court's broad sentencing discretion.   ***See Walls, supra***; ***Fullin, supra***.   Therefore, even if Appellant's claim presented a substantial question, it would merit no relief.

In her last issue on appeal, Appellant argues her new sentence for first-degree murder is an illegal *de facto* life sentence.   Appellant concludes this Court should vacate and remand for resentencing.   We disagree.

A claim that a court sentenced a juvenile defendant to a *de facto* LWOP sentence goes to the legality of the sentence.   ***Foust, supra*** at 422.   A challenge to the legality of a sentence is a question of law.   ***Commonwealth v. Barnes***, 167 A.3d 110, 116 (Pa.Super. 2017) (*en banc*).   Thus, our standard of review is *de novo* and our scope of review is plenary.   ***Id.***

In ***Foust***, this Court noted "[t]here are certain term-of-years sentences which clearly constitute *de facto* LWOP sentences.   For example, a 150-year sentence is a *de facto* LWOP sentence.   Similarly, there are clearly sentences which do not constitute *de facto* LWOP sentences.   A sentence of 30 years to life falls into this category." ***Id.*** at 438.   The ***Foust*** Court, however,

> decline[d] to draw a bright line…delineating what constitutes a *de facto* LWOP sentence and what constitutes a constitutional term-of-years sentence.   ***But see Commonwealth v. Dodge***, 77 A.3d 1263, 1276 (Pa.Super. 2013), *appeal denied*, 625 Pa. 648, 91 A.3d 161 (2013) (appearing to hold that…defendant must be parole eligible before…she turns 90 for it not to be considered…*de facto* LWOP sentence).   We similarly decline[d] to set forth factors that trial courts must consider when making this determination, *i.e.*, whether they must look to the life expectancy of the population as a whole or a subset thereof and whether the defendant must be given a chance at a

meaningful post-release life.

*Id.*

In light of **Foust**, this Court has outlined a method to determine whether a sentence constitutes a *de facto* LWOP sentence:

> The key factor in considering the upper limit of what constitutes a constitutional sentence, in this narrow context, appears to be whether there is some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Implicit in this standard is the notion it would not be meaningful to provide an opportunity for release based solely on the most tenuous possibility of a defendant's surviving the minimum sentence imposed. To be meaningful or, at least, potentially meaningful, it must at least be plausible that one could survive until the minimum release date with some consequential likelihood that a non-trivial amount of time at liberty awaits. Thus, though it expressly declined to do so, the **Foust** Court seemed to suggest some sort of meaningful-opportunity-for-release standard by declaring that a 150–years–to–life sentence constitutes a *de facto* LWOP sentence.

**Commonwealth v. Bebout**, 186 A.3d 462, 467 (Pa.Super. 2018) (internal quotations marks and citations omitted) (concluding sentence of 45 years to life imprisonment did not constitute *de facto* LWOP sentence in violation of **Miller**, where appellant had been incarcerated for underlying offense since he was 15 years old and will be eligible for parole at age 60). **See also Commonwealth v. Blount**, 207 A.3d 925 (Pa.Super. 2019), *appeal denied*, ___ Pa. ___, 218 A.3d 1198 (2019) (deciding sentence of 35 years to life imprisonment was not illegal *de facto* LWOP sentence; noting appellant was incarcerated for related offense at age 17 and will be eligible for parole at age 52); **Commonwealth v. White**, 193 A.3d 977 (Pa.Super. 2018) (holding

sentence of 35 years to life imprisonment was not illegal *de facto* LWOP sentence; explaining appellant had been incarcerated for underlying crime since he was 17 years old and will be eligible for parole at age 52).

Instantly, the court resentenced Appellant to 35 years to life imprisonment for first-degree murder. Appellant has been incarcerated since she was 16 years old and will be eligible for parole when she is 51 years old. Therefore, Appellant's sentence does not constitute a *de facto* LWOP sentence and is not an illegal sentence under **Miller**. **See Blount, supra**; **White, supra**; **Bebout, supra**. Thus, Appellant's claim that her new sentence for first-degree murder amounts to a *de facto* life sentence fails. **See Foust, supra**. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/14/2020